UNITED STATES, Appellee

v

NORMAN W. SWAIN, Private E–2, U. S. Army, Appellant

8 USCMA 387, 24 CMR 197

No. 9634

Decided November 8, 1957

First Lieutenant William L. Garwood argued the cause for Appellant, Accused. With him on the brief were Lieutenant Colonel James M. Scott and First Lieutenant Bert M. Gross.

*First Lieutenant James G. Duffy* argued the cause for Appellee, United States. With him on the brief was *Lieutenant Colonel Thomas J. Newton.*

## Opinion of the Court

HOMER FERGUSON, Judge:

On September 14, 1944, the accused, while assigned to a Quartermaster group stationed at Chalons, France, absented himself without authority from his unit. At the time he absented himself he had intended to visit Paris and remain away "approximately forty-eight hours." Almost twelve years later he was apprehended in Paris by French police. At his court-martial he pleaded not guilty of desertion, in violation of Article of War 58, 10 USC (1946 ed) § 1530. He was found guilty as charged, however, and sentenced to be confined at hard labor for twenty-five years, together with a dishonorable discharge and total forfeitures. The convening authority reduced the period of confinement to six years but otherwise approved the sentence. The findings and sentence were subsequently approved by a board of review without opinion. The question presented by this appeal is whether the law officer erred in failing to instruct the court-martial on the lesser included offense of absence without leave.

At trial, the prosecution introduced documentary evidence which proved the inception and termination of the alleged absence. A pretrial statement obtained from the accused was also admitted into evidence. In his statement the accused detailed his activities during the period of his absence. Through the first few years he was able to subsist by eating at Army transient mess halls and by staying in transient barracks. Although frequently stopped by the Military Police he was always able to produce false pass or furlough papers which could be easily purchased at a minimum of cost. His major source of income was derived from purchasing cigarettes at various military installations and then selling them on the French black market. In the four-year period preceding his apprehension he lived with and was supported by his French fiancée who was aware of his status and implored him to turn himself in but he just "could not bring myself to do it."

At the completion of the prosecution's presentation the defense introduced two stipulations of testimony which were joined in by the prosecution with the consent of the accused. The first stipulation concerned the testimony of an Air Force officer who had known the accused since childhood and who had seen him on several occasions in Paris prior to his apprehension. If present in court, he would have testified that on each occasion he had urged him to return to military control and the accused had stated "that he did intend to do so." The second stipulation related to the testimony of the French police officer who had apprehended the accused. He would have testified that at the time the accused was taken into custody he was heard to remark that he was very happy that he had been apprehended and that it had taken "a great load off my mind."

The accused, testifying in his own behalf, recounted generally his activities during his sojourn in Paris. He had worked part time "for a gentleman well known in the art world in Paris" while also attending art school where he studied "the technique of painting." As the period of absence lengthened he became confused and felt ashamed for his family and "just kept putting it off [his surrender] from day to day." Throughout the entire duration of the absence, however, he always used his real name, carried his medical identification card and wore his Army uniform "Until it practically fell off." He steadfastly maintained several times during trial that he never intended to desert the service of the United States.

At the conclusion of argument by counsel the law officer instructed the court on the elements of the offense of desertion. He further charged the court as follows:

"The court is further advised that with respect to lesser included offenses, it is the responsibility of the Law Officer to determine, in the light of the evidence before the court,

whether a lesser included offense is in issue and whether an instruction thereon is required.

"A lesser included offense is in issue whenever on all of the evidence, including proper inferences and applicable presumptions, there could be a reasonable doubt that the principal offense charged was committed by the accused but less doubt that the lesser included offense was committed.

"*The court is advised that the evidence places before the court only the issue of guilt or innocence of the principal offense charged. Therefore, no instructions will be given as to lesser included offenses.*

"The court is further advised that it may not find the accused guilty of any offense unless it has been advised as to the elements thereof. If, however, the court wishes to consider any lesser included offense it must first open and request advice as to whether such offense is lesser included and, if so, for instructions as to the elements thereof." [Emphasis supplied.]

The law officer concluded by giving the standard instructions that the accused must be presumed to be innocent until proven guilty, that a reasonable doubt as to his guilt should result in acquittal, that if a reasonable doubt as to the degree of guilt exists "the finding must be in a lower degree as to which there is no reasonable doubt," and that the burden of proof rests upon the Government. There were no objections nor requests by counsel. The court-martial, after deliberating some forty-nine minutes, returned a finding of guilty of desertion.

The accused contends before this Court that the lesser offense of absence without leave was raised by the evidence, and the law officer therefore was under an affirmative duty to so instruct even in the absence of request by counsel. The Government, on the other hand, urges that the law officer did not err by failing to instruct on the lesser offense because the accused's story that he did not intend to desert was "inherently incredible and totally unworthy of belief." At the outset there should be laid aside certain things which are not involved in this case. We are not here concerned with whether the evidence is sufficient as a matter of law to sustain the court-martial's findings. Neither are we concerned with the weight to be accorded the accused's testimony. Our determination is simply whether credible evidence exists in the record which would require the law officer to instruct on the lesser offense. We cannot say as a matter of law that such evidence does not exist.

In addition to the accused's testimony, which was neither contradicted nor rebutted, the prosecution had joined in two stipulations of testimony which constituted evidence indicative of an intent on the part of the accused to return. Furthermore, the law officer, by his instructions, effectively precluded the court from finding the lesser included offense of absence without leave. This, we believe, goes beyond mere comment on the evidence. It amounted to directing a verdict against the accused. Such a practice has no support in any of our cases. Although in United States v Andis, 2 USCMA 364, 8 CMR 164, we adopted the Federal practice which permits a judge to comment on the evidence, we said that such power was subject to the limitations found in paragraph 73*c*(1), Manual for Courts-Martial, United States, 1951, that such comments "do not extend beyond an accurate, fair, and dispassionate statement of what the evidence shows, both in behalf of the prosecution and the defense."

Although the defense did not proceed on an all or nothing basis, as in United States v Wilson, 7 USCMA 713, 23 CMR 177, the only alternative to conviction here presented by the law officer was outright acquittal. After instructing the court-martial "that the evidence places before the court only the issue of guilt or innocence of the principal offense charged," it is difficult to perceive why the law officer further instructed that if the court wished to consider a lesser included offense it should open and request advice and finally the standard instruction that a reasonable doubt

**389**

as to the degree of guilt should be resolved by finding the accused guilty of the lower degree. What lower degree of guilt existed? The law officer had completely eliminated any possibility of the court's finding a lesser included offense.

It is interesting to note that the court-martial here deliberated forty-nine minutes before reaching its findings. If the accused's testimony was so totally unworthy of belief, and if the law officer's instructions were so "unquestionably complete and correct" —as the Government impresses upon us—then we pause to wonder why the court-martial took so long in arriving at its findings. It may well be that the court members were faced with a rather perplexing dilemma. They could not very well acquit the accused—in view of his judicial confession of an unauthorized absence for the past twelve years—without violating their oath as court members. Furthermore, upon being told by the law officer that there were no lesser offenses, they could do but one thing, viz., find the accused guilty as charged. In order to do this they would have to completely ignore all evidence presented by the defense whether deemed credible or not. Thus, in the last analysis, the only function to be performed by the court-martial was the formalization of the law officer's directed verdict against the accused.

Recently, in the case of Buchanan v United States, 244 F2d 916 (CA6th Cir) (1957), the Court of Appeals reversed a conviction where the trial judge's instructions invaded the province of the jury. In the course of its opinion, the court said:

"The court cannot direct a verdict of guilty in criminal cases, even if the facts are undisputed. Dillon v. United States, 2 Cir., 279 F. 639. It cannot do indirectly what it cannot do directly, and by its instructions in effect advocate such a verdict of guilty. Weare v. United States, 8 Cir., 1 F. 2d 617."

The accused pleaded not guilty and the only real issue presented at trial related to his intent. It was within the exclusive province of the members of the court to believe or disbelieve the accused's testimony as they saw fit. The choice, however, was theirs and not that of the law officer. In United States v Tubbs, 1 USCMA 588, 5 CMR 16, the law officer had instructed the court that there was no offense lesser included in the offense of misbehavior by cowardly conduct in the presence of the enemy. We reversed that conviction because such an instruction effectively precluded the court from exercising its right to bring in a finding based upon a lesser included offense. The Chief Judge, in authoring the Court's opinion, said in pertinent part that:

". . . It is sufficient to say that the court-martial has, by law, an unrestricted right to find the accused guilty as charged, guilty of any lesser offenses included within the specification, or not guilty. The law officer erred in instructing the court that they did not have this right. It is not for us to determine what this court-martial would have found in relation to the charge and specification had the erroneous instruction not been given."

The rule stated in the Tubbs case, supra, is tailored to fit the circumstances presented in the instant case.

We conclude, therefore, that the law officer erred by failing to instruct on the lesser offense of absence without leave. The finding of desertion and the sentence are set aside and the record is returned to The Judge Advocate General of the Army for reference to a board of review. The board may, in its discretion, order a rehearing on the original charge or affirm a conviction of the lesser offense of absence without leave and reassess the sentence on that basis.

Chief Judge QUINN concurs.

LATIMER, Judge (dissenting):

I dissent.

There are two errors in this opinion of which I take cognizance. First, the law officer did not direct a finding against the accused and the authorities cited to support that proposition are inappro-

priate. Merely because the posture of the evidence was such that the lesser offense was not raised as a reasonable alternative to desertion and the law officer took that particular offense away from consideration by the court-martial, that did not compel them to convict the accused. They could have found him not guilty. Any compulsion in this record is found in the evidence and not in the instructions. If my views are not the law, then a law officer cannot in any case tell a court-martial that lesser included offenses are not in issue.

The second error is found in the holding that absence without leave was raised reasonably by the ▉▉▉▉▉▉ ▉ testimony. Of course, I am in error if a reasonable person could possibly conclude that this accused did not intend to remain away permanently, but I surmise the word permanent is used by the Code in the sense that the status of absence is lasting and not temporary or transient, and this accused, in spite of his self-serving declaration to the contrary, removed all doubt about any intent to return.

The facts which the Court mentions as being favorable to the accused with three exceptions are not evidence of an intent to return. First, he wore his uniform in France. That was necessary during the war years and shortly thereafter to keep from being apprehended as a deserter. Second, he carried an identification card. That, too, was necessary to remain absent successfully, and it aided him in his plan to escape detection. Furthermore, it offered a means of getting meals and lodgings at camps maintained for the benefit of transient servicemen and it gave authenticity to his false passes and furlough orders. Third, he used his own name. He had to do that to prevent arousing suspicion when he used his only secure means of identification. None of those facts show a fighting desire to return. On the contrary they show aids to his plan to escape detection.

The three exceptions mentioned above are his statement to his friend Lieutenant Colonel Proulx that he intended to turn himself in, his mental relief on being apprehended and his statement on the witness stand that he did not intend to remain away permanently. As to his statement to the Lieutenant Colonel, it is interesting to note that this long-time friend, some eleven years after the commencement of the unauthorized absence, on five occasions importuned the accused to return. In response of these importunities accused stated he intended to surrender. Significantly enough he did not say when, and he did not surrender. Whether he intended to return or not, what other answer would the accused give a lifelong friend who was in the military service?

In what manner the fact that accused was mentally relieved when apprehended shows he intended to return remains a mystery to me. I imagine that any person who has for nearly twelve years had to evade the toils of the law would upon finally being caught feel relieved that his life of deceit had ended. That relief would be the same whether the offense was wartime absence without leave or desertion. Both crimes carried severe penalties.

That leaves for discussion the question of accused's own testimony that he intended to return. In the light of the evidence I hereinafter set out, that self-serving statement is so inherently improbable and unworthy of belief that the law officer could reject it in toto. This was a wartime absence commenced after accused heard his unit was going forward. He was gone for approximately twelve years and, in spite of his professed intent, he had to be returned by French Police who apprehended him as a deserter. For some considerable time he lived near and frequented military posts, so that he had ample opportunity to surrender. He disregarded the advice of his fianceé and a good friend. He concealed his status by using forged passes and furlough orders. He remained overseas away from his family and community ties, and at least part of the time made his living outside the law. In nearly twelve years time, he never took one affirmative step to return to military control.

There are cases where actions speak so loudly that statements of future intent are hollow and this just happens to

fall in that category. Of course I cannot say for a moral certainty that some time before death intervened this accused might not return, but I can say that there is nothing in his life's pattern during the period involved that even remotely suggests that possibility. Permanency only means continuing in the same condition, status, or the like and here I find the facts show an intent to retain his absentee status forever, barring arrest and forced return.

I would affirm the decision of the board of review.