UNITED STATES, Appellee

v

EDWARD J. CAILLOUETTE, III, Airman Third Class,
U. S. Air Force, Appellant

12 USCMA 149, 30 CMR 149

No. 14,359

Decided January 27, 1961

*Captain Hugh J. Dolan* argued the cause for Appellant, Accused. With him on the brief were *Colonel James L. Kilgore* and *Major Charles K. Rush.*

*Lieutenant Colonel Simpson M. Woolf* argued the cause for Appellee, United States. With him on the brief was *Lieutenant Colonel Merlin W. Baker.*

## Opinion of the Court

HOMER FERGUSON, Judge:

Accused was charged with assault with intent to commit rape, in violation of Uniform Code of Military Justice, Article 134, 10 USC § 934. He was found guilty of indecent assault, in violation of the same Article. With some reduction in the sentence, intermediate appellate authorities affirmed, and we granted review on the issue whether the law officer erred in failing to instruct upon the effect of intoxication upon the specific intent to gratify his sexual desire involved in the lesser crime.

Evidence adduced at the trial revealed that the victim was suddenly attacked in the latrine of the building in which she resided. Fortunately, her resistance to the assault proved successful, and her assailant fled. She was under the "impression" that he was blond and wore a checked shirt and light trousers. Her roommate observed a tall blond man leaving the latrine immediately after hearing the victim's screams. Neither the victim nor the roommate could recall seeing the accused, a small Negro airman, in the building.

Other witnesses in nearby quarters heard the victim's cries and left their residence. They saw accused running near the barracks in which the offense occurred and chased him. They eventually succeeded in capturing him. At the time of his apprehension, accused was naked from the waist up. At his own request, he was taken to the Air Police Station. En route, he admitted that he accompanied an unidentified friend to the victim's residence and waited outside while the other entered the latrine. He claimed to have fled when he heard the screams. At the Air Police Station, a bite mark, conforming to one allegedly inflicted by the victim, was discovered on his right side. When this was pointed out to him, accused went "berserk" and had to be forcibly restrained. Eventually, he was taken to the hospital.

On the following day, accused executed a voluntary statement in which he confessed to the assault on the victim.

One of the prosecution witnesses who testified regarding the accused's apprehension also declared that he had seen him earlier in the evening. On cross-examination, defense counsel drew from him considerable information regarding accused's sobriety. Thus, the witness stated "I would say that he had had quite a bit of alcohol to my knowledge." He further testified that there was an "obvious smell" of alcohol on accused's breath when the parties arrived at the Air Police Station.

Captain Ralph S. Metheny, a medical officer, testified for the prosecution regarding accused's admission to the hospital on the night of the incident. He related that accused was admitted "in a state of alcoholism, with signs of recent injury on his body." On cross-examination, he testified that accused had been drinking, had a strong odor of alcohol on his breath, "and lapsed into unconsciousness shortly after his arrival." Initially, accused was violent and repeatedly rammed his head against the wall. He was in "a state of acute alcoholism." No blood test was given "because of his inability to agree to such a test being made." It was Dr. Metheny's impression that accused's unconsciousness resulted from his alcoholic condition.

There can be no doubt that the foregoing evidence is sufficient to raise an issue concerning whether accused was too intoxicated to possess the capacity to entertain the specific intent involved in the offense of which he was found guilty. United States v Morphis, 7 USCMA 748, 23 CMR 212; United States v Backley, 2 USCMA 496, 9 CMR 126. Indeed, accused's bizarre actions at the Air Police Station and hospital, as well as his final lapse into unconsciousness, indicate he "was intoxicated to the point of ambulatory stupefaction." United States v Miller, 2 USCMA 194, 195, 7 CMR 70. Moreover, the law officer recognized the existence of the issue, for he instructed on the effect of accused's drunkenness with respect to his capacity to entertain the specific intent to rape involved in the crime charged. See United States v Morphis, supra, at page 755. To be sure, there was evidence from which a state of sobriety more compatible with the existence of the requisite intent might have been inferred, but it is not our duty to assume the role of fact finders—a function which is quite beyond the scope of the authority granted us by the Code. Code, supra, Article 67, 10 USC § 867. Accordingly, it is clear that an instruction should have also been given by the law officer with respect to accused's capacity to entertain the specific intent to gratify his sexual desires, a necessary element of

indecent assault, the lesser offense of which he was convicted. United States v Miller, supra; United States v Backley, supra. His failure to do so requires reversal.

The thrust of the dissenting opinion is directed to the proposition that the defense case turned upon the question of an alleged failure to identify the accused as the victim's assailant and the lack of evidence to establish that he intended ultimately to overcome her resistance to his advances by force and violence. The principal support for this belief is said to be found in the scope of the defense counsel's final argument and his cross-examination of Government witnesses. The latter consideration simply lacks validity in face of the fact that, in almost every instance, it was the defense counsel who adduced evidence of accused's drunkenness through his interrogation of the prosecution witnesses. Thus, as noted above, it was he who developed the opinion that accused was drunk earlier in the evening and upon his arrival at the Air Police Station. It was also he who established that accused had been diagnosed as suffering from acute alcoholism and was too drunk to consent to the taking of a blood sample. Finally, it was he who, in his cross-examination, first adverted to the fact that accused persisted, both at the Air Police Station and at the hospital, in ramming his head aginst the wall and in other violent episodes. In light of this action on counsel's part, it is hardly permissible to contend that his cross-examination was not intended to introduce into the case a question of accused's capacity to entertain a specific intent.

The rationale with regard to the defense counsel's final argument is subject to the same defect. While it is true that he adverted to other theories during his summation, it is also clear beyond cavil that he intended to place before the court-martial the legal effect of accused's drunkenness. Thus, he stated in his closing argument:

". . . Let's assume for a minute to begin with that the accused's identity had been established in this case, that the witnesses that you heard—

**151**

the victim of the case and her friend—had definitely established the identity of this accused as the person who made the attack. Let's assume that this point is not in question, and let's see then whether you could find the accused guilty of assault with intent to commit rape beyond a reasonable doubt.

"It is the contention of the defense that there is no evidence to prove that whoever committed that attack on Miss Parellada did so with intent to commit rape. To begin with, if this were the accused, the evidence before you would indicate that he was in an acute alcoholic condition. To have intent, there must be a positive, definite, premediatated [sic] thought as to actually culminating an act of rape. This has not been proved. The most that the prosecution can even ask of you is to infer from the circumstances.

"I think it's highly unlikely that a person in the state of sobriety as apparently the accused was, assuming he made the attack, could have the requisite intent or such requisite intent to be inferred from the circumstances that the prosecution has presented before you. Probably, if this were the accused, he didn't even know why he was there. If someone had stopped him in that area, I sincerely suspect he could not have given a reason as to why he was there."

The foregoing extract removes all force from the contention that there was a deliberate selection of issues on the part of the defense counsel and that he did not intend to raise the question of accused's intoxication. Thus, there is no basis for reliance upon our holding in United States v Bowers, 3 USCMA 615, 14 CMR 33, wherein the sole defense advanced was that of alibi and counsel deliberately avoided any mention of intoxication on the basis that it would clearly weaken an otherwise substantial defense. As we there noted, at pages 619–620:

". . . A successful appellate system cannot be built if we are to permit an accused to elect one course at the trial level and then, if that turns out disastrously, grant him a reversal so that he may have a chance to retry the case on a theory *he previously rejected.*" [Emphasis supplied.]

The situation is quite different when an accused is not willing to risk his future upon the single question of identity, particularly when that appears to be solved by his confession, and desires that the fact finders also consider whether his capacity for drink eliminated his capacity to intend.

In sum, then, the evidence of intoxication placed in issue accused's capacity to entertain the specific intent to gratify his lust and the law officer's failure fully to instruct the court members with respect thereto was prejudicial error.

The decision of the board of review is reversed, and the record of trial is returned to The Judge Advocate General of the Air Force. A rehearing may be ordered.

LATIMER, Judge (concurring):

I concur.

I do not believe the defense in this case abandoned the defense of intoxication to win or lose on an all-or-nothing proposition. Neither can I accept the Government's refined premise that facts concerning intoxication which will raise a doubt about an accused's capacity to entertain a specific intent to rape are not sufficient to raise an issue about his inability to form a specific intent to satisfy his sexual desires. While that point might possibly be debated from a physiological or philosophical point of view, I suggest that any difference is too refined for instructional guidance.

The law in this area is clear for we have previously held that this form of indecent assault requires a specific intent, and that evidence of intoxication may raise an issue which will reduce the offense if the testimony is of the quality and quantity which would raise a reasonable doubt about an accused's capacity to form the intent required by law. United States v Burgess, 2 USCMA 542, 10 CMR 40; United

States v Burden, 2 USCMA 547, 10 CMR 45; United States v Wycliff, 3 USCMA 38, 11 CMR 38; United States v Hobbs, 7 USCMA 693, 23 CMR 157. In the instant case, I am not influenced to find the issue was raised because the law officer gave an instruction on intoxication as it might affect the specific intent to rape requisite to the offense charged, for it could be that he did so out of a spirit of commendable caution. United States v Christensen, 4 USCMA 22, 15 CMR 22; United States v Sharp, 5 USCMA 580, 18 CMR 204. The evidence which does compel me to conclude the issue was raised reasonably finds its root in the testimony of third parties, particularly the medical expert.

While I have no way of ascertaining the reason prompting the law officer to limit the effect of ˙ntoxication to the principal offense, I suspect he may have overlooked the legal proposition that the intermediate offense upon which he instructed included specific intent as an element. In that connection, a law officer ought to make certain that when intoxication is raised reasonably as a defense, his charge is tailored to cover all specific intent offenses which he mentions in his instructions.

QUINN, Chief Judge (dissenting):

It is apparent from the defense counsel's cross-examination of the Government witnesses, and the testimony of the defense witnesses, that the defense case was based on two theories. First, was the idea that the manner in which the assault was committed showed the attacker did not intend to effect penetration by force. The second theory advanced was that some person other than the accused committed the assault. Both theories were reviewed at length in defense counsel's closing argument. He said:

". . . Let's assume for a minute to begin with that the accused's identity had been established in this case, that the witnesses that you heard— the victim of the case and her friend —had definitely established the identity of this accused as the person who made the attack. Let's assume that this point is not in question, and let's see then whether you could find the accused guilty of assault with intent to commit rape beyond a reasonable doubt.

.  .  .  .  .

"We have evidence that Miss Parellada was hit. This, I assume, is an assault consummated by a battery. However, the circumstances surrounding this assault do not suggest beyond a reasonable doubt that his assault was done with intent to commit rape.

"I'd like for you to recall the testimony of Miss Parellada, that she remained seated the entire time the assailant was there; the assailant did not request her to stand up; he did not lift her up; he did not direct that she move in any more favorable position; he did not try to turn her in any different position. And certainly an act of rape would be impossible in such a position, and yet the prosecution would have you infer from this attack that it was made with intent to commit rape. . . .

.  .  .  .  .

". . . The only thing in this case that would legally sustain a finding of guilty of assault with intent to commit rape is the fact that the accused, in a statement to the OSI, tucked in, almost as a little afterthought to that statement, this concise statement: 'I was there with the intent to commit rape,' or something to that effect.

"The accused has taken the stand and told you the circumstances relating to the giving of that statement and, more particularly, for this point in hand, he told you what he believed the OSI told him—what he is confident the OSI implied to him— as to the definition of intent to commit rape.[1] Certainly, if we take what the accused thought the OSI was tell-

---

[1] Although the accused's testimony on the meaning of the phrase was offered and received for the limited purpose of contesting the voluntariness of his pretrial statement, it is obvious that defense counsel treated it as bearing

ing him, this is not the requisite intent to commit rape. . . . At the most, as the OSI, we contend, impied [sic] to the accused—told the accused—this is not the intent to sustain a finding of assault with intent to commit rape.

"Again, the most that can be drawn from the circumstances and the entire evidence in the case is that there was an indecent assault upon Miss Parellada, and it is possible that the only logical inference that can be drawn, the only concrete, clear evidence in the case would indicate that there was merely an assault with a consummated battery.

"Now let's look at another part of the case, and that has to do with the identity of the accused. I think it's safe to say that but for the statement that the accused gave to the OSI, he would not be in court today for the offense under consideration. In fact, I cannot help but think if I were sitting here in court today with a blond, white client who had been found in that area and who had had on a checkered shirt, I have no doubt but what you gentlemen would and could find him guilty of assault with intent to commit rape, with or without a confession on his part. And it is amazing to me that the prosecution would now ask you, on the sole basis of a statement given to the OSI, to find this accused, who could not meet the identity of blond, white, and so forth, guilty of the offense for which he is charged.

"Undoubtedly the accused was in the area of building 605 on the night of 15 September 1959. He was caught running from the general area. He voluntarily gave the details of his participation in the incident that night. I contend that the facts are almost overwhelming that the accused gave a correct, true version of what happened on that night when he gave a story to the persons who caught him in the area. Again, I insist that this statement is of more

logical credibility because it is part of what we lawyers call the res gestae. . . .

• • • • •

"I again want to point out that too many details of the original statement that the accused gave check out. He says that the other fellow went into the latrine and fixed the lights. The results of the fingerprint test— and that is the only test in this case which is accurate, definitive and not open to question—that test definitely establishes that it was not the accused who unscrewed the light bulbs. That checks out. And I'd like for you to note that in the statement the accused gave the OSI he says that he unscrewed them.

• • • • •

"There is only one other thing in the case that in any way negates the proposition that the person who made the attack was not the accused, and that is there were certain fingernail scrapings taken from under the fingernails of Miss Parellada which contained apparently bits of skin. They were sent to a laboratory. The report came back that they appeared to be characteristic of the Negroid race. They did not say, 'This is epidermis from a person who is Negroid.' They didn't even say, 'It is characteristic of such epidermis.' They said, 'It appears to be characteristic.' Clearly, they refused to identify it as even one race. Howbeit can you be asked to say it was the accused?

"Also, they said that this skin was admixed with red, white and blue cloth fibers. The blond person who was in this area had a checkered shirt on. One of the colors which has been mentioned was red and white, and there was a dark color. Witness Voss testified it was red and white. Now clearly Miss Parellada says that she fought, bit, struggled with the assailant. And I say that the only way that threads could be admixed with skin epidermis is for

upon the merits. I need not consider the effect of this enlargement of the purpose of the testimony. See United States v McQuaid, 9 USCMA 563, 26 CMR 343, and United States v Johnpier, 12 USCMA 90, 30 CMR 90.

the two to have taken place at substantially the same time with force and violence so as to admix them."

At the conclusion of counsel's argument, the law officer apparently held an out-of-court conference with counsel to consider the instructions. The conference is mentioned in the record of trial, but, except for a matter not relevant to the issue before us, nothing of what transpired is set out. When court was reopened, the law officer gave the court-martial extensive instructions. No objection or request for further instructions was suggested by defense counsel.

Among other things, the law officer advised the court members of the elements of the offense of assault with the intent to gratify lust and sexual desire, and those of assault and battery, as lesser included in the elements of the offense charged. He also instructed the court that it could consider the evidence of accused's intoxication as it affected his mental capacity to entertain an intent to rape. He told the court that if such consideration left it with a reasonable doubt of the accused's ability to entertain the intent to rape, it must find him not guilty of the assault charged. No similar instruction was given on the effect of intoxication on the accused's mental capacity to entertain the intent of the lesser offense of indecent assault. The omission is now advanced as a fatal error requiring reversal of the conviction of the lesser offense of indecent assault.

Government counsel contend that no instruction on the effect of intoxication was required as to the lesser offense of which the accused was convicted. They base their conclusion on two grounds. First, they maintain that evidence of intoxication which falls short of establishing "legal insanity" cannot rebut the presumption of the existence of an intent to gratify lust which is inherent in a completed indecent assault. See United States v Jackson, 6 CMR 390; cf. United States v Headspeth, 2 USCMA 635, 636, 637, 10 CMR 133. Second, they contend that the intent to gratify lust is much less "definitive, specific and complex"

than the intent to commit rape, and it, therefore, requires more evidence of intoxication than the latter intent in order to require an instruction. In their opinion, the evidence of intoxication is insufficient to require an instruction as to its effect on the accused's mental capacity to gratify his lust and sexual desires. It is, however, unnecessary to consider either argument. The nature of the defense at the trial precludes appellate review of the present claim of error.

A substantially similar situation was before us in United States v Bowers, 3 USCMA 615, 14 CMR 33. There, as here, the accused was charged with an offense involving a specific intent. The evidence tended to show the accused was intoxicated. The defense, however, was directed toward showing the accused was not the person who committed the crime. No instruction was given on the effect of intoxication on the "gradations of the crimes involving specific intent." The accused was convicted. In due course, the conviction was appealed to this Court. The accused contended he was prejudiced by the law officer's failure to instruct on the effect of intoxication. We held that the theory of the defense at the trial level operated as a bar to the claim of error on appeal. We pointed out that the appellate contention was based upon another and different view of the evidence from that presented at the trial. In part we said:

"There are certain cases wherein an accused elects to make an unqualified selection as to the issues to be submitted and is bound thereby. Particularly is this true when the raising of one doubtful defense will weaken substantially one which has considerable merit. . . .

.    .    .    .    .

"We deal here with a record which shows a case well tried. No question of oversight or inadvertence breaks through defending counsel's trial tactics. A successful appellate system cannot be built if we are to permit an accused to elect one course at the trial level and then, if that

turns out disastrously, grant him a reversal so that he may have a chance to retry the case on a theory he previously rejected. . . . We believe accused is the one who must prevent that dilemma. If he does not want an inconsistent theory injected into the deliberations of the court-martial, he may make that election by stating that he does not want any instructions other than those given, as did counsel in this case. If, however, he desires to take a chance on a verdict of a lesser offense, he should specifically request appropriate instructions so that he cannot complain if they are given."

Here, in the *Bowers* case, intoxication was important to the defense, not as an issue affecting his mental capacity, but as a matter of corroboration of his exculpating account of the incident. The matter was presented to contrast the difference between the "real" culprit, whose act concededly amounted to an indecent assault and upon whose breath the victim could detect no odor of alcohol, and the accused who purportedly had "consumed quite a bit of alcohol" and was never inside the building in which the assault took place. In this setting, the law officer's failure to instruct *sua sponte* on the effect of intoxication on the intent inherent in an indecent assault is not error prejudicial to the accused. I would, therefore, affirm the decision of the board of review.