UNITED STATES, Appellee

v

THOMAS MOORE, Airman First Class,
U. S. Air Force, Appellant

12 USCMA 696, 31 CMR 282

No. 14,856

March 16, 1962

*Major Charles K. Rush* argued the cause for Appellant, Accused. With him on the brief were *Murray Sprung, Esquire, Colonel James L. Kilgore,* and *Colonel Philip J. Williamson.*

*Lieutenant Colonel Simpson M. Woolf* argued the cause for Appellee, United States. With him on the brief was *Colonel Merlin W. Baker.*

## Opinion of the Court

FERGUSON, Judge:

Despite the original recommendation of the pretrial investigating officer that he be brought to trial only on charges of involuntary manslaughter, in violation of Uniform Code of Military Justice, Article 119, 10 USC § 919, a position with which the convening authority did not agree, accused was arraigned before a general court-martial upon a specification alleging unpremeditated murder, in violation of Code, supra, Article 118, 10 USC § 918. He was found guilty and sentenced to dishonorable discharge, forfeiture of all pay and allowances, reduction, and confinement at hard labor for forty years. The convening authority reduced the period of confinement involved to twenty years but otherwise approved the sentence. The board of review affirmed, and we granted accused's petition for review upon two issues. In light of our action, we need, however, only reach the assignment that:

"THE LAW OFFICER ERRED IN INSTRUCTING THE COURT-MARTIAL THAT A FINDING OF GUILT OF ANY OFFENSE LESS THAN MURDER WAS NOT PERMISSIBLE."

Stated in another way, the question before us is whether the law officer prejudicially omitted to instruct upon the lesser included offense of involuntary manslaughter. As the ultimate answer to this inquiry must lie in the evidence presented to the court-martial, we turn to the matters depicted in the transcript.

At approximately 12:15 a.m. on October 11, 1959, accused came to Airman Jackson's quarters. He told Jackson his six-year-old adopted daughter, Mari Yvonne Moore, "was dead, or he thought she was dead." Jackson

dressed, and the two men proceeded to the North Gate, Itazuke Air Base, Japan. There, they called an ambulance from the local Air Force hospital. On the way to the North Gate, Moore told Jackson that, in the preceding afternoon, he "had beat or whipped his child."

Captain Harold J. Forney, an Air Force medical officer, accompanied the ambulance to accused's home. Before he entered the house, he asked accused what was wrong with the little girl. Accused replied that " 'I suppose I beat her to death.' " Dr. Forney proceeded directly to a bedroom in accused's home. There, he examined Mari's body and pronounced her dead. The body "had multiple contusions, bruises, on the front surface of her thorax, and her abdomen and her arms." Dr. Forney caused the Air Police to be summoned.

An autopsy was performed on Mari's body by a qualified pathologist, Major J. Gordon Webster. He lucidly described her injuries. The body bore three types of contusions. The largest class consisted of "a multiple parallel type lesion, or bruise, applied to multiple skin surfaces over the anterior or front portion of the body, including mainly the trunk, but also present on the extremities." The physical characteristics of these lesions suggested the use of a "flexible type of instrument." These bruises were also present on the "surfaces of the back."

The second type of bruise was broad. It "occurred over the extremities, or the arms, the legs, and the buttocks."

The third type of injury was semilunar lacerations. There was "several small lacerations over the face, a larger one on the shoulder . . . [and on] the left hip . . . a semilunar—or moon-shaped—laceration." The "majority portions of the body had been subjected to severe multiple blows." The tissue damage frequently extended to the underlying bony structure of the body.

Dr. Webster, based upon his detailed external and internal examination of the body, was of the view that death resulted from suffocation "due to swallowing of stomach content, precipitated by a status of secondary or delayed shock." The "delayed shock was induced by severe multiple traumatic blows, which were deep in nature, delivered to the majority skin areas of the body." The shock led the child to vomit, and the aspiration of the regurgitated material caused her to suffocate.

Dr. Webster was of the opinion that the multiple parallel lesions and the semilunar lacerations could have been inflicted by a flexible rubber tube found in accused's home. This instrument was approximately twenty-nine inches in length. Its outside diameter was approximately one-half inch. The broader contusions could have resulted from use of a small baseball bat also found in accused's home. The bat was approximately eighteen inches long and one and one-half inches in diameter at the large end. A blow which caused damage to the child's spleen could also have come from an instrument such as the bat or "the heavy hand of a powerful individual."

At approximately 4:00 a.m. on October 11, the accused executed a voluntary pretrial statement. In it, he disclosed that, at approximately 6:00 p.m. on the preceding day, he had become "very angry" at Mari because of her disobedience of his Japanese wife and an instance of enuretic behavior. He seized the piece of rubber tubing described above and struck the child "once or twice across the back." She ran into her room, and accused followed her. There, he seized her and struck her "about twenty-five times on the back and the front, as she jumped and twisted." When accused desisted, Mari ran into the living room. There, she told Mrs. Moore that she had to go to the bathroom. When told to do so, she "changed her mind," and accused struck her "a hard blow in the right side with my open hand" for "lying about needing to go to the bathroom." The blow "knocked her to the floor."

Accused decided to go to the air base bowling alley. He took Mari with him. There, he purchased some food and drank a bottle of beer. He bought Mari orange juice. After drinking it, she put her head on the table and ap-

peared to go to sleep, accused gathered her up and returned home. There, the family ate, and Mari drank some Pepsi-Cola. She started "to breath [sic] hard, and her eyes looked blurred." She complained of pain and walked unsteadily. Accused put her to bed, and she appeared to go to asleep. Later, he became worried and examined her to see if he had fractured a rib. Unable to detect any broken bones and noticing that her breathing was apparently normal, he returned to the living room. Approximately one hour later, he went into Mari's room on an errand. He discovered that her eyes were "rolled back" and that she "appeared to be dead." He shook her, listened to her heart, and felt her pulse, but could detect no sign of life. He called his wife and told her Mari was dead. His wife ran out to a nearby house and aroused their maid. Together with a Japanese male (then unknown to the accused but subsequently identified as a doctor), they returned to the house. During their absence, accused unsuccessfully attempted artificial respiration. The Japanese doctor advised contacting Air Force authorities, and accused sought the assistance of Airman Jackson as indicated above.

Moore concluded his statement by declaring his belief "that the beating I administered to MARI was the cause of her death."

At the trial, accused elected to testify in his own behalf. He repudiated those portions of his pretrial statement in which he recounted the infliction of a severe whipping upon the victim. He stated that he had discovered lipstick smeared on a little table in his daughter's room. He questioned her about the matter and, when she denied having "been in the lipstick . . . stung her on her behind with the hose once." Mari confessed, and accused hit her "approximately five times with the hose." He then told his wife to bathe her and left to visit the base. When he returned, accused found Mari sobbing, and his wife told him that she had punished her for being "bad," using the rubber hose and striking her several times with the baseball bat. Accused's

testimony thereafter substantially followed his pretrial statement.

Accused declared that his allegedly false pretrial statements were made in an effort to protect his pregnant wife against possible exclusion from the United States and prosecution by Japanese authorities. After her departure from Japan had been forbidden and receipt of a letter from his brother urging that he shield no one, he decided to tell the truth.

On cross-examination, he admitted writing a letter to a Sister Clarella at the orphanage from which he obtained Mari. In the letter, accused stated:

"' . . Although I did not do it intentionally, I have committed the unforgiveable sin. I have taken something that I cannot give in return, and that is Life . . . . I took my daughter's life not in the act of the beating, but I believe the beating was the cause of her death several hours later. Sister Clarella please pray for me, and ask all others that know how to pray to pray for me. When I say pray for me I mean not for me personnally [sic], but to pray that others in this world do not make the same dreadful mistake that I have."

Accused testified that the letter was another attempt to protect his wife against retribution. Mrs. Moore also appeared as a witness. She generally corroborated accused's testimony concerning her responsibility for Mari's punishment. She wished "to discipline the child and make good child of her."

Other evidence was adduced on the part of the defense to the effect that, among those who knew him, accused was noted for his devotion to Mari and the kindness with which he treated her. There is also evidence of his refusal to allow his wife to chastise the child in view of her tendency to be overly severe.

The law officer instructed the members of the court-martial with respect to the elements of the offense charged and gave other advice pertinent to the issues in the case. He concluded, however, that there was no evidence which

**699**

placed any lesser included offense before the court. Accordingly, he announced that he would not instruct the members on "any offense other than unpremeditated murder."

The propriety of the law officer's determination depends upon an evaluation of the evidence which ■■■■■■ ■ we have summarized for, almost since its inception, this Court has adhered to the proposition that a military judge must *sua sponte* instruct the members of a court-martial on the elements of offenses lesser included in those charged if there appears in the record some evidence from which the fact finders could reasonably infer guilt of the inferior crime. United States v Clark, 1 USCMA 201, 2 CMR 107; United States v Simmons, 1 USCMA 691, 5 CMR 119; United States v Williams, 1 USCMA 231, 2 CMR 137; United States v Wilson, 7 USCMA 713, 23 CMR 177; United States v Swain, 8 USCMA 387, 24 CMR 197.

In the *Clark* case, we examined the provisions of Code, supra, Article 51, 10 USC § 851, and determined that it positively required *sua sponte* instructions on lesser offenses, stating, at page 205:

> "While the wording of the Act mentions offense in the singular, the wording of the Manual requires that instructions will be given to cover the elements of each offense charged. Included offenses are charged within the principal charge, and it is consistent with the Code and with the federal civilian practice to require that they must be defined in instructions, subject to the well-established rule that there must be some evidence from which a reasonable inference may be drawn that the lesser included offense was in issue."

The Government, recognizing this well-established principle, nevertheless urges upon us the contention that this record does not present a basis for its invocation. Their approach is twofold. First, it is argued that the evidence simply does not present a question of homicide in a degree less than unpremeditated murder. Secondly, it is sug-

gested that the accused himself is the party responsible for the instructional lack, as his entire trial strategy was devoted to establishing his complete innocence by demonstrating the guilt of his wife. Thus, it is contended that the law officer's error, if it exists, was induced by the defense counsel.

We may at once dispose of the latter argument. In United States v Mundy, 2 USCMA 500, 9 CMR 130, ■■■■■■ ■ we reiterated our holding that the duty to instruct concerning lesser included offenses rested upon the law officer and that his failure properly to advise the court-martial was not excused by defense counsel's lack of request for such instructions or failure to object to their absence. Nonetheless, we went on to state that the doctrine of waiver would be invoked if the record demonstrated "an affirmative, calculated, and designed course of action by a defense counsel before a general court-martial" to the end that he led the presiding law officer to believe he did not desire instructions on lesser included offenses. United States v Mundy, supra, at page 503. In that case we found defense counsel expressly consented to the law officer's course of action and affirmed without regard to the effect of the admitted error. See also United States v Bowers, 3 USCMA 615, 14 CMR 33, and United States v Duggan, 4 USCMA 396, 15 CMR 396.

The principle was most succinctly described in United States v Wilson, 7 USCMA 713, 23 CMR 177, at page 715:

> "In another course of decision, however, we have recognized that defense counsel must be given the opportunity to frame a theory or hypothesis of defense, and that he may, if he so chooses and the law officer acquiesces, elect to take his chances on an 'all or nothing' verdict—quite without regard to whether or not certain lesser included offenses might be raised by the evidence. United States v Mundy, 2 USCMA 500, 9 CMR 130; United States v Bowers, 3 USCMA 615, 14 CMR 33; United States v Jackson, 5 USCMA 584, 18 CMR 208; United

States v Snyder, 6 USCMA 692, 21 CMR 14.

"In all of the cases cited in the preceding paragraph, the law officer was guided by the express desires, or at least deluding conduct, of defense counsel, and did not give instructions on the lesser included offense or offenses. Perhaps in several it could fairly be said that there was considerable doubt as to whether the lesser offense was really raised. Nevertheless, in all of those cases our holding was based, though sometimes only in part, on the principle that a defense counsel who pursues a deliberate course of conduct at trial, and thereby invites the law officer to instruct on his theory of defense and thereafter restrict the issues, has no ground for complaint upon appeal if it turns out that he has miscalculated the temper of the court-martial."

It will be seen from the foregoing that only the rare case will fall into the exceptional class to which the Government would have us consign this trial. Here, our scrutiny of the record discloses neither an express request for lack of instructions regarding lesser degrees of homicide nor "deluding" tactics which might have led the law officer to conclude that the defense counsel consented to such an omission. United States v Mundy, supra; United States v Wilson, supra. Rather, the former expressly stated to the court-martial that he was relying on his own personal opinion in ruling that there must either be a finding of guilty as charged or an acquittal.

True it is that the defense counsel concentrated upon the presentation of evidence tending to establish that the accused's wife was the guilty party, but to say that at the same time he actively and deceptively sought to exclude any differentiation in the degree of the offense committed is to ignore the consistency of the two approaches. In effect, the Government was required to establish two principal matters. The first was the commission of the homicide in the degree charged, and the second was the identity of the accused as the guilty agent. Attack upon the second would be in nowise weakened by adoption of the position that the first extended in law to no more than manslaughter. Yet, as noted above, the self-induced error theory is bottomed upon a deliberate choice to restrict the defense assault to one directed toward the assertion that accused was the guilty agent. United States v Mundy, supra. In short, we simply cannot discover anything in this record to substantiate a position that defense counsel, expressly or by implication, intentionally contributed to the law officer's failure to instruct the court-martial. Cf. United States v Caillouette, 12 USCMA 149, 30 CMR 149. Accordingly, we turn to the question whether there is evidence in the record reasonably permitting the jury to reach findings of guilty of involuntary manslaughter.

At the outset, it must be realized that we deal here with special circumstances, for the homicide charged involves the death of a child as the result of too severe punishment at the hands of her parent. The parent-child relationship is an important consideration in determining whether the accused sought the death of his child *malo animo*. Warren on Homicide, Perm ed, § 118. The pertinency of the accused's status *vis a vis* that of his victim is set forth in Wharton, The Law of Homicide, 3d ed, § 472, as follows:

". . . Parents, masters, and other persons having authority *in foro domestico* may give reasonable correction to those under their care, and if death ensue without their fault, it will be no more than an accidental death, not imposing criminal liability. But if the correction exceed the bounds of due moderation, either in the measure of it or in the instrument made use of for the purpose of administering it, it would be either murder or manslaughter, according to the circumstances of the case."

The same authority states, in § 473,

with regard to the need for instructions on the elements of manslaughter:

> ". . . And where it might be inferred from evidence that the parent killing his child in correcting him was not actuated by intention to kill, or by an evil or cruel disposition, the law with reference to absence of intent to kill should be given to the jury, as well as where the intention clearly and evidently appears."

See also 26 Am Jur, Homicide, § 202; 40 CJS, Homicide, § 58; and the cases collected in Annotation, 37 ALR 709.

Our inquiry is directed, then, to whether there is evidence in the record indicating a lack of intent to kill or inflict grievous bodily harm on the part of accused and reasonably justifying the members of the court in attributing the result of the punishment visited upon the child either to culpable neglect or the commission of an offense, other than the felonies set forth in Code, supra, Article 118, directly affecting the victim's person. Code, supra, Article 119(b)(1), (b)(2). We conclude that this standard is fully satisfied.

Initially, as noted above, weight must be given to the effect of the parent-child relationship which accorded the accused the right reasonably to chastise Mari. Thus, the first blows struck with the rubber tubing cannot *per se* be said to amount to the use of excessive force. There can, however, be no dispute over the fact that the brutal beating which followed constituted the use of punishment far in excess of that allowed by law. From this, however, it does not follow that accused *necessarily* intended to inflict death or grievous bodily harm. So to hold would mean that, assuming such to be the natural and probable consequence of his deliberate use of the hose, the court members must infer as a matter of law that he intended the infliction of death or grievous bodily harm. We have nonetheless pointed out that this inference of intent is permissive only. United States v Miller, 8 USCMA 33, 23 CMR 257; United States v Ball, 8 USCMA 25, 23 CMR 249.

It is here that we believe the United States goes astray in its reasoning. Pointing to the evidence that the accused intentionally used the hose in a manner likely to produce death or grievous bodily harm, it argues that he must have intended one of these consequences and, hence, is guilty of murder. This approach, however, directs itself to the sufficiency of the evidence—a point with which we are not now concerned—rather than to the nonexistence of a predicate for instructions on unintentional homicide. But we need not satisfy ourselves with a negative demolition of the Government's position, for there is also in the record a plenitude of evidence which, if believed, would be inconsistent with the existence of an intent to kill.

Accused's pretrial statement, his trial testimony, and his letter to Sister Clarella permit the inference that Mari's death was unintentionally caused. Thus, he refers to his purpose only to inflict punishment as a correctional measure and reinforces his recital of a lack of intent by stating that, following the beating, he had the child dressed and took her for an outing. In addition, a number of witnesses testified to his prior kind disposition toward the child and his tendency to abstain from use of corporal punishment. Moreover, his examination of Mari and concern for possible injuries permit the inference to be drawn that he acted without the requisite intent.

All of these factors should have alerted the law officer to the need for instructions on the lesser included offense of involuntary manslaughter, for they constitute beyond doubt "some evidence" from which guilt might be reasonably inferred in the lesser degree. United States v Clark, supra; United States v Black, 12 USCMA 571, 31 CMR 157. We are not at liberty to disregard these matters or to reject them as incredible. Only the fact finders may properly judge their weight and the law officer's failure to give them correct legal guideposts by which to measure accused's guilt in light of this evidence requires that we set aside the findings of guilty.

The decision of the board of review is reversed, and the record of trial is returned to The Judge Advocate General of the Air Force. A rehearing may be ordered.

Judge KILDAY concurs.

QUINN, Chief Judge (dissenting):

The majority's reliance upon the normal relationship between a parent and child is so completely misapplied in this case as to be shocking. Wharton,[1] the principal authority cited by the majority, expressly states that death resulting from a beating administered by a parent is murder or manslaughter "according to the circumstances of the case." The body of this five-year-old child is so battered and beaten that it shrieks of an intent to kill or inflict grievous bodily harm. Death resulting from an act accompanied by either intent is murder. But my brothers are strangely silent as to the intent to inflict grievous bodily harm.

The instrument used, a reinforced rubber hose, and the number of fatal wounds on the body of the young and defenseless victim compel the conclusion that the person who inflicted the wounds intended to either kill or inflict grievous bodily harm. However, we must, say my brothers, shut our eyes to these circumstances and close our minds to the compellingly logical conclusion because the one who battered the child to death is her adopted father. The figure of Justice is portrayed with a blindfold, but the symbol stands for impartiality to the parties, not the loss of eyesight. I cannot be so blind or so unthinking as to allow the parent-child relationship to obscure the nature of the wounds suffered by the child, and the means by which those wounds were

caused. As a matter of fact, I contend that the relationship imposes a special responsibility upon the parent to guard the child against harm, whether it be by an act of another or by his own hand. Of course, we may presume that a parent would not willingly cause the death of his child, but that presumption, like any other presumption, yields to the actual facts. The facts here overwhelmingly rebut the presumption.

The kind of beating administered this little girl completely and irrefutably excludes any possibility she was killed as a result of culpable negligence resulting from an indifferent and casual excess of parental discipline. Consequently, the only circumstance that indicates the existence of manslaughter rather than murder is that she was killed in the "heat of sudden passion" on adequate provocation. Yet the record is bare of evidence of the existence of any such emotion and provocation. Not a trace of the existence of such passion in the accused appears in his pretrial admissions that he beat the child. And certainly there is no trace of it in the accused's testimony at the trial, because he tried to saddle the responsibility for the crime on his wife. What of the wife's testimony that she beat the child but did not know "where or how hard [she] hit her?" Her recital of her purported chastisement because the child wet her pants and failed to get a hairbrush shows the exact opposite of passion and provocation; it reveals a calm and collected purpose to "discipline the child and make [a] good child of her." Manslaughter, therefore, is simply not in issue as a possible alternative to the offense charged. In my opinion, the law officer was entirely correct in not instructing on that offense.

I would affirm the decision of the board of review.

---

[1] Wharton, The Law of Homicide, 3d ed, § 472.