UNITED STATES, Appellee

v

HOWARD R. SNYDER, Private E–2, U. S. Army, Appellant

6 USCMA 692, 21 CMR 14

693

No. 6851

Decided February 24, 1956

*Lieutenant Colonel Jackson K. Judy* argued the cause for Appellant, Accused.

*First Lieutenant Peter J. Hughes* argued the cause for Appellee, United States. With him on the brief was *Lieutenant Colonel Thomas J. Newton.*

## Opinion of the Court

GEORGE W. LATIMER, Judge:

The accused comes before us convicted of premeditated murder, in violation of Article 118, Uniform Code of Military Justice, 50 USC § 712, and violation of a general regulation, contrary to Article 92 of the Code, 50 USC § 686. He was sentenced to dishonorable discharge, total forfeitures, and confinement for life. Intermediate appellate agencies have affirmed, and we granted review to determine whether the law officer erred in failing to instruct on the lesser offenses of voluntary and involuntary manslaughter.

Because of the nature of the issue before us, the facts must be recited in some detail. At about 10:00 p.m. on October 1, 1954, the accused and a friend, Private Mickle, "picked up" two German females of friendly disposition at a gasthaus near Neilingen Kaserne, Germany. After consuming a substantial quantity of alcoholic bev-

694

erages, but not sufficient to render him intoxicated, the accused excused himself for a few minutes. During his absence, the victim, Webb, approached the accused's woman companion, and was talking to her when the accused returned. The accused ordered Webb to leave, but the victim declined to do so. Apparently the two antagonists were facing each other with the victim having his hands in the pockets of his trench coat, and the accused holding a knife in his right hand. After Webb declined to depart in accordance with the directions given him, the accused Snyder pushed him with his left hand and a scuffle ensued. Webb broke away and ran some forty yards with the accused in hot pursuit. Whether the victim was stabbed before he ran, or was overtaken and wounded, is not made clear, but he collapsed some distance from the start of the scuffle, and died within about fifteen minutes. The accused rejoined his previous companions in short order, and he was observed returning his knife to its sheath. Thereafter, the two couples retired to the semiprivacy of a nearby thicket, where the parties carried out the earlier agreement to have intercourse.

At about 2:00 a.m., October 2, 1954, the accused and Mickle decided to return to their billet. En route to a nearby hole in the Kaserne fence, they passed the victim, who was lying lifeless on the ground. At this point the accused stated "there's a boy laying up there," and a few seconds later asked Mickle to deny having seen him if asked about the incident. Both went to bed without either aiding Webb or reporting the matter. In fairness to Mickle, it should be said that he gave as his reason for rendering no aid, that he had assumed Webb was drunk, not knowing the victim had been stabbed.

The victim was found the following morning, and a post-mortem examination revealed that death had resulted from an injury to the heart. The weapon used was a sharp, double-edged dagger, having a blade over six inches in length. It had been used with such force that it pierced a trench coat, wool jacket, shirt, undershirt, and penetrated the heart to a depth of three inches.

The accused had owned a 10-$\frac{1}{2}$ inch bonehandled double-edged dagger with a 6-$\frac{1}{2}$ inch blade for some time prior to the homicide, and this weapon was obtained from him by the investigating officers. In addition, an open pocket knife with a blade of about two and one-half inches long was found near the body of the deceased.

The accused made two pretrial statements, but because their conflicts with his sworn testimony are relatively unimportant, their contents will not be related separately. He testified that shortly after he returned to find Webb conversing with Miss Kuester, he and the victim got into an argument over his female companion's character and her apparent preference for the accused; that they raised their voices in argument; that he did not intend to stab the victim; that, although "passion was aroused," he was not angry to the point where he would have cut his adversary; that his woman friend called out that Webb had something in his hand, and Webb began to swing at him with a knife; that the victim cut him on the left collar bone and cut the right lapel of his jacket; that Webb was advancing and he became frightened and backed up; that he then drew his knife, intending only to bluff Webb but swung at him with a circular motion, and inflicted the fatal wound; that the victim told him "You cut me," and ran; that the accusation was made in such a casual manner that he believed Webb was joking; that he pursued the victim to learn the truth of the matter; that when he came up to Webb a second time, the latter repeated his accusation, and fell to the ground; that because he was of the opinion that his victim was probably bluffing, he did not seek to obtain aid of any sort; and that he did not normally carry a knife, but had purchased his dagger only for a souvenir.

It was shown on accused's behalf that Webb was of violent disposition, and given to using a knife to intimidate anyone who crossed him. By way of rebutting accused's story, it was shown by the Government that on October 2, 1954, he had a superficial scratch, about two and one-half inches long, just above

his left collar bone. However, the scratch did not appear to be fresh.

During an out-of-court conference, defense counsel requested instructions on self-defense, voluntary manslaughter, and involuntary manslaughter, among others. The law officer stated that while he doubted the included offenses were raised reasonably, he was willing to give the requested instructions. In discussing with defense counsel their appropriateness, he expressed the opinion that to so instruct might jeopardize the accused's claim of self-defense, for instructions on manslaughter would be "somewhat incompatible" with that defense. He, however, left no doubt in anyone's mind that if the defense wanted the instructions given he would honor the request. Subsequent to the out-of-court hearing, he permitted defense counsel time to consider the question, and after pondering over the matter during the luncheon recess, counsel withdrew his request for instructions on the lesser offenses. Thereupon the law officer gave instructions on premeditated and unpremeditated murder, self-defense, and certain collateral issues. Included in the instructions given were those submitted by the accused and not withdrawn. It is now urged that the law officer had no right to comment on the inconsistencies in the requested instructions, or to rely upon the action of trial defense counsel, but, instead, was duty bound to instruct on the lesser offenses named earlier.

## II

We are met at the outset by the question of whether voluntary and involuntary manslaughter were raised reasonably by the evidence. If they were not, of course, our present difficulty would be obviated, for if they were not raised as issues, no instructions were required. United States v Black, 3 USCMA 57, 11 CMR 57. Because they require different treatment, they will be discussed separately herein.

Appellate defense counsel contends that voluntary manslaughter was made an issue by the testimony of the accused, for, if believed, it established that Webb attacked him with

696

a dangerous weapon, and that the accused acted in the heat of passion engendered by fear. It is settled law in the military and civilian Federal courts, that voluntary manslaughter and self-defense are not inconsistent defenses to a charge of murder, Kinard v United States, 96 F2d 522, 526 (CA DC Cir) (1938), and that the heat of passion which reduces murder to voluntary manslaughter may be engendered by fear. Stevenson v United States, 162 US 313, 16 S Ct 839, 40 L ed 980 (1896). Provocation sufficient to produce heat of passon, resulting in a befuddlement of the senses of the killer and an absence of malice, may give such a character to a homicide as to reduce it to voluntary manslaughter; and the same provocation may, under other circumstances or viewed in another light, justify a killing in self-defense. Wallace v United States, 162 US 466, 16 S Ct 859, 49 L ed 1039 (1896). The core of a claim of self-defense to a homicide is a reasonable belief that death or great bodily harm is imminent, and that the taking of a life is necessary to prevent either from happening to the defender. Manual for Courts-Martial, United States, 1951, paragraph 197c, page 351–352; Brown v United States, 256 US 335, 343, 41 S Ct 501, 65 L ed 961 (1921). Heat of passion may or may not be present. Kinard v United States, supra. In the case of United States v Desroe, 6 USCMA 681, 21 CMR 3, we expressly held that the heat of passion required to establish voluntary manslaughter may be engendered by fear, as well as anger, a view that we had earlier expressed by way of dicta, United States v Adams, 5 USCMA 563, 18 CMR 187. Thus there would be more than superficial validity to appellate defense counsel's claim that voluntary manslaughter was raised, if the evidence was as clear as he says it is.

When we turn to the evidence, we have no doubt that if the testimony of the accused was believed, adequate provocation to engender heat of passion was shown. Surely an attack by an antagonist armed with a knife would be likely to arouse in an ordinary man

such a degree of passion, either through anger or fear, as to cause him to act on impulse and without reflection, and this is the test of provocation. Manual for Courts-Martial, supra, paragraph 198a, page 353. Similarly, the testimony of some of the prosecution witnesses alone might be enough to suggest, as a reasonable alternative to murder, that this homicide could have occurred during a sudden, mutual affray between two armed antagonists where tempers flared up and emotions overcame the capacity to premeditate or to form the requisite intent to kill. But for the purposes of raising an issue, the evidence must be viewed as a whole, and a killing cannot be manslaughter unless both provocation and heat of passion concur. 40 CJS, Homicide, § 46. Thus, provocation alone, however adequate, will not serve to characterize a homicide as voluntary manslaughter unless that provocation aroused violent passion in the accused and he acted while in the grip of that emotion. Wharton, Criminal Law, 12th ed, § 583; 40 CJS, Homicide, supra; 5 LRA (NS) 809, 812; Cottrell v Commonwealth, 271 Ky 52, 111 SW2d 445, 450 (1937).

In this case, the accused testified that although in both parties "quite a bit of passion was aroused," he was not so angry with Webb that he would have intentionally injured him. He explained the quoted phrase by saying "our voices were raised, and we were arguing." The whole thrust of his testimony seems to have been directed toward establishing that, although he was frightened to a point where he backed up to avoid the asserted aggressive acts of the victim, no particular "heat of passion" was aroused within him. As a matter of fact, the pattern of his conduct and behavior immediately before and after the killing showed an absence of emotion and a lack of any feeling of fear, hate or anger sufficient to interfere with his normal mental processes. His methodical approach to the killing, and his calloused abandonment of the victim for the purpose of returning to his previously arranged

rendezvous, bespeak little mental confusion. Hence it is reasonable to conclude that the testimony as reflected by this record failed to raise an issue of voluntary manslaughter. However, as will be later developed, we need not rest our affirmance on this ground. We present the arguments largely to show that the law officer was not wrong in expressing some doubt concerning whether voluntary manslaughter was raised as an issue.

So far as involuntary manslaughter is concerned, it was originally the contention of defense counsel at trial, reiterated before us on appeal, that it was raised as an issue, for there was evidence that "the killing occurred while the accused was perpetrating an offense directly affecting the person of the victim, i.e., assault with a dangerous weapon." Counsel, to substantiate the assertion, points to the evidence that an altercation arose between Webb and the accused, and that a certain amount of physical contact was evident to the witnesses. This, it is argued, coupled with the accused's assertion that he only intended to bluff the victim, negates any intent to kill or do great bodily harm. It would seem that counsel's argument defeats his contention, for he admits, for the purposes of this issue, that the accused committed an assault with a dangerous weapon. It is not doubted that, according to the accused's testimony, he drew his dagger and, with one circular sweep of his arm, inflicted the fatal wound. We have no difficulty in concluding that a 10-½ inch dagger with a 6-½ inch blade is, when used as a dagger, a dangerous weapon as a matter of law. That is, its use as such, within reasonable proximity to another, is likely to result in death or great bodily harm. Stabbing at the victim under the circumstances shown by this record rendered it more than probable that death or great bodily harm would ensue. No one suggests that this death is traceable to any intervening cause or any hidden physical defect of the victim, and surely the death of Webb was no accident which could not have reasonably been anticipated by the accused. United States

**697**

v Robertson, 5 USCMA 806, 19 CMR 102; United States v Weems, 3 USCMA 469, 13 CMR 25. Having conceded, arguendo, the commission of the offense of assault with a deadly weapon, accused's contention that he did not intend to use the knife to inflict great bodily harm becomes unworthy of belief. He testified he was not angry or confused, and he could remember in detail the manner in which he reached around and held the sheath with his left hand, seized the dagger with the right, and, by swinging his right arm horizontally, cut the victim through a field overcoat, a jacket, shirt, underwear, and drove the dagger into Webb's heart. One who uses a two-edged razor-sharp dagger at such close proximity, and with the force of a good swing, cannot help but intend to do great bodily harm. Particularly is that true when the person wielding the knife, by his own testimony, negates the presence of any mental disturbances which would interfere in any substantial degree with his capacity to understand and know the action he was taking. The accused was not confused when he reasoned that his knife was larger than the one he claims was in the possession of the victim, and that he could bluff the victim by threatening to put his dagger to use. Under those circumstances, the disclaimer of any intent to do great bodily injury is incredible. However, once again we mention that we need not rely entirely on the ground that an issue of involuntary manslaughter was not raised.

### III

We will, for the purposes of this portion of the opinion, concede, arguendo, that both voluntary and involuntary manslaughter were raised as issues in the case. We must then face the Government's contention that there was an advised affirmative waiver and that accused cannot raise the error on appeal.

As early as United States v Clark, 1 USCMA 201, 2 CMR 107, we held that it is the law officer who bears the burden of insuring that the fact find-

ers are instructed as to the elements of those lesser included offenses which are raised reasonably by the evidence. Furthermore, we have held that a mere failure of defense counsel to request such instructions, or object to their absence, will not serve as a waiver of his rights in this regard, United States v Williams, 1 USCMA 186, 2 CMR 92. However, we have ever been mindful of the principle that defense counsel must be given freedom to frame the hypotheses of his case, and that he may, if he so chooses, elect to take his chances on an "all or nothing" verdict. We have required only that the record show clearly that his waiver of instructions on included offenses in such instances was the result of an affirmative, deliberate course of conduct on his part.

In United States v Mundy, 2 USCMA 500, 9 CMR 130, a lesser included offense to the principal charge was raised by the evidence. The law officer first gave instructions on that offense, but later withdrew them. When asked if he had any objections to the instructions, defense counsel replied in the negative. This Court affirmed, saying:

"Obviously the conduct of the defense counsel in this instance was not a mere failure to object, or to request appropriate instructions. His actions were affirmative, deliberate and evidential of a conscious design. The only reasonable inference to be drawn from these tactics is that he did not desire the lesser included offense submitted for the court's consideration, on the theory that, by eliminating a showing of willfulness, he hoped to obtain a complete acquittal. Necessarily a certain risk attends all tactics at trial level. When carefully considered tactics fail, the defense cannot be permitted to seek, upon appeal, further opportunity to indulge its tactical guesses at a new trial."

In the later case of United States v Bowers, 3 USCMA 615, 14 CMR 33, the accused was charged with unpremeditated murder and assault wherein grievous bodily injuries were intentionally inflicted. A defense of alibi was raised which had considerable merit,

and a doubtful issue of assault with a dangerous weapon was also presented by the evidence. Defense counsel elected to have only the defensive theory of alibi submitted by way of instructions, and we affirmed, saying:

". . . The tactics adopted by the defense counsel, and constantly adhered to during the trial of this case, make it clear that any defensive measures based on the grounds of intoxication were deliberately abandoned. The most that accused could have hoped for had that stand been chosen would have been conviction of a crime of lesser importance on one specification and guilty of the other. An alibi, if successful, offered a finding of not guilty on both. The gamble was well worth taking and so a request by the accused for the reductive instruction would have been ill-chosen. A similar situation confronted the law officer. Had he instructed upon the issue *sua sponte,* he might have suggested his disbelief of the story told by the witnesses for the accused. In addition, he would have interjected an issue which might have resulted in a possible compromise finding not wanted by the accused. That defense counsel preferred not to have the defense of alibi weakened by admitting the possible presence of the accused at the scene in a condition so drunk he knew not what he was doing, seems apparent from his failure to develop that theory by direct evidence; his failure to unfold it on cross-examination; the failure to mention it in final arguments; and, lastly, the failure to request any instruction on that issue when an opportunity to do so was offered by the law officer."

When we apply the rationale of those cases to the facts before us, we can only conclude that defense counsel consciously and after careful deliberation elected to submit his case to the court on the theory that his client was guilty of premeditated murder, unpremeditated murder, or not guilty at all. After requesting instructions on the manslaughter offenses, he was given an out-of-court hearing at which he and the law officer exchanged views. The law officer volunteered the information that the instructions might be harmful to the accused because of his defense of self-defense. He may have erred in his judgment on the inconsistency of the defenses, but he carefully explained his views to defense counsel and made it plain that he would accede to the defense wishes. Defense counsel was afforded time to consider his tactics, he contemplated the desirability of such instructions for over an hour, and then he affirmatively withdrew his requests. In addition, after he had argued his case and the instructions had been given, he was afforded a further opportunity to request that additional instructions be given. We are not here dealing with an abandonment of counsel's duty, as his choice was not without substantial support in the record, for he had raised an issue of self-defense. The pretrial statements and testimony of the accused had consistently advanced that theory. Although there were some weak spots in that hypothesis, and it had been contradicted in important particulars, any other line of defense suffered from the same infirmities. Furthermore, support for the claim of self-defense had been drawn from the evidence showing that the victim was of violent disposition, and had thrust himself into the group in the absence of the accused. Accused's testimony sought to establish that the victim was the aggressor, and that the accused was seeking to repel an attack by a knife wielder with like force. Any evidence tending to support the alternative theories of manslaughter, if present, was weak and doubtful, as we have shown earlier. If the accused could not raise a reasonable doubt about his guilt of murder by his claim of self-defense, he could not hope to escape substantial punishment. Any strategy which might increase his possibility of winning ought to be seized upon by his counsel. Under all the circumstances, the gamble may not have been the best, but if accused's story was believed by the members of the court, he was entitled to be freed, and not to a compromise finding on a lesser offense. Any retreat from his principal defense would lessen his chances for an acquittal. At best, a

concession of guilt of an aggravated assault would only reduce his period of confinement and it would undoubtedly increase his chances for conviction of murder. Defense counsel weighed the relative risks and made a conscious choice. Viewed in that light, counsel on appeal has no cause for complaint because of the failure of a well-considered defense tactic at the trial.

Although appellate defense counsel seeks to escape the effect of the waiver at the trial level by arguing that the law officer unfairly talked defense counsel into withdrawing his request for instructions on the manslaughter offenses, we find no merit in this contention. The law officer told defense counsel that instructions on the manslaughter offenses would be "somewhat incompatible" with the claim of self-defense and tend to jeopardize that defense. If our analysis of the evidence, set forth earlier, is correct, he was not wrong in his comments, for the evidence as to "heat of passion" was weak, if not nonexistent, and an admission by defense counsel that the accused had committed an assault with a dangerous weapon would detract from his testimony that the victim was also armed with a knife and that he was only meeting force with a like degree of force. If accused only met force with force, he was not guilty of an aggravated assault, and any undercutting of that hypothesis would leave him defenseless. Of course, defending counsel may argue alternative and inconsistent theories, but the law officer may point up the potentialities for harm in diffusing the strength of one position, so long as he leaves a free choice to counsel. Here the law officer made certain that the decision was left squarely up to defense counsel, saying that he would instruct on the manslaughter offenses if counsel persisted in his request. When counsel at trial knowingly pursues one theory, counsel on appeal cannot shift to an adverse theory, simply because the one chosen at the lower level did not result in an acquittal. Defending counsel at the trial demonstrated that he was qualified to perform his duties in the defense of the accused, thus the choice made is not chargeable to one who inadequately represented his client.

Accordingly, the decision of the board of review is affirmed.

Chief Judge QUINN concurs.