UNITED STATES, Appellee

v

DEXTER M. MOORE, Private First Class,
U. S. Army, Appellant

16 USCMA 375, 36 CMR 531

No. 19,296

September 9, 1966

*Captain Paul V. Melodia* argued the cause for Appellant, Accused. With him on the brief were *Joseph A. Croghan, Esquire, Colonel Joseph L. Chalk, Lieutenant Colonel Martin S. Drucker,* and *Captain Peter A. Anderson.*

*Captain Richard J. Andriolo* argued the cause for Appellee, United States. With him on the brief were *Colonel Joseph J. Crimmins, Lieutenant Colonel Francis M. Cooper,* and *Captain Anthony L. Tersigni.*

## Opinion of the Court

FERGUSON, Judge:

Tried by a general court-martial convened by the Commanding General, 82d Airborne Division, at San Isidro, Dominican Republic, the accused was convicted of unpremeditated murder, in violation of Uniform Code of Military Justice, Article 118, 10 USC § 918. He was sentenced to dishonorable discharge, forfeiture of all pay and allowances, confinement at hard labor for twenty years, and reduction to the grade of Private (E–1). The convening authority approved the sentence. The board of review reduced the period of confinement involved to fifteen years, but otherwise affirmed. We granted accused's petition for review on issues dealing with the law officer's instructions. As the assignment inquiring whether he erred prejudicially in failing to instruct on the lesser included offense of involuntary manslaughter

**375**

serves to dispose of the case, we limit our opinion to that question.

## I

Accused was stationed with his unit in the Dominican Republic. On the evening of May 10, 1965, he left his company area without authority and went to a nearby bar. He was accompanied by two other soldiers, Wilson and Derrickson. All were armed with automatic rifles. There had been numerous reports and rumors of rebel activity in the city, directed against American troops. Incidents had in fact occurred.

Accused's weapon was loaded in the bar, and the testimony indicates he expressed a desire to kill a rebel before the night was over. During the group's stay in the bar, accused met his ultimate victim, Perez. Wilson developed a headache and Perez offered to lead them to a drug store from which he might obtain some patent remedy for it. Perez led the group to a civilian home a few blocks away, to which a pharmacy was attached. The owner admitted them. Immediately thereafter, accused pointed his weapon at the owner and his son, but soon desisted. At Perez' request, the owner procured a headache remedy and a glass of water for Wilson. Accused suspiciously caused the owner to drink some of the mixture before permitting Wilson to consume any.

Accused appeared very nervous and expressed the desire to leave, as did Perez. Accused, however, ordered Perez to remain. Wilson led Derrickson from the pharmacy and returned to get the accused. They became engaged in an argument, culminating in threatening each other with their weapons. Perez again said something about leaving. Accused slapped his face and ordered him to sit down, as he was not to leave with them. Wilson heard noises from another room and grew suspicious. As he entered the other room to investigate, he heard shots. On immediately returning, he saw Perez lying near the door and accused running outside.

The victim died almost at once from a gunshot wound fired from accused's rifle. Six expended cartridges were found on the scene, and bullet holes were found both near the entrance door and the rear door.

In both his pretrial statement and his trial testimony, accused denied any intent to shoot Perez. He declared it was his understanding the victim was to lead them to a place where women might be obtained. Having heard the rumors and reports of rebel activity and claimed attacks on American soldiers, he was suspicious— doubly so, upon arriving at the house and pharmacy. There, Wilson told him he was only seeking a headache remedy. After it had been obtained, tested, and consumed, accused wished the party to leave and return to their compound. He ordered Perez to remain seated in the pharmacy. When Wilson went to investigate noises in the other room, accused heard other sounds behind the rear door. Feeling his suspicions of an ambush had been confirmed, he opened automatic fire towards the rear door. He heard Perez running toward the entrance and, turning, shot toward that door in an effort to prevent his escape, as:

". . . He was going toward Derrickson and I didn't know whether he had a weapon, if he was trying to get to Derrickson or what. I just went and shot in that area. I wasn't trying to hit him, sir."

Moore denied any malice or ill will toward Perez or any motive to shoot him. He stated his only intent was to stop Perez' departure by shooting in front of him. He wanted to keep him in the room until the group had departed, as he feared Perez and others were members of the rebel forces and intended to launch an attack upon them.

## II

As we have heretofore stated, a law officer is required to instruct, *sua sponte,* on the elements of those lesser offenses included within that charged, when there is presented in the record some evidence which would allow the

376

fact finders reasonably to conclude that accused was guilty only in the lesser degree. United States v Moore, 12 USCMA 696, 31 CMR 282; United States v Wilson, 7 USCMA 713, 23 CMR 177; United States v Strong, 1 USCMA 627, 5 CMR 55. The test is evidence, not credibility. United States v Black, 12 USCMA 571, 31 CMR 157. The law officer did instruct on the lesser offense of voluntary manslaughter. In our opinion he should have also instructed on involuntary manslaughter.

In both his pretrial statement and his testimony, the accused denied any intent to shoot or harm Perez. He repeatedly stated his only desire was to force Perez to remain in the room until he and his companions had departed, due to his fears that they were about to be subjected to a rebel assault. True, his statements did not go uncontradicted by the other evidence, and there is a plenitude of proof in the transcript to sustain the verdict of the court-martial. But, as we have noted above, that is not our measuring rod as to whether a lesser included offense has been placed in issue. United States v Moore, supra.

Code, supra, Article 119, 10 USC § 919, provides that one who "unlawfully kills a human being . . . while perpetrating or attempting to perpetrate an offense, other than those named in clause (4) of section 918 of this title (article 118) [felony murder involving burglary, sodomy, rape, robbery or aggravated arson], directly affecting the person; is guilty of involuntary manslaughter and shall be punished as a court-martial may direct."

Assuming accused's fears concerning Perez and any connection he might have with rebel activities were totally unjustified, but that he spoke truthfully in stating he shot only to stop his victim's escape and not in any manner *at* him, it would appear the deceased was unlawfully killed during the commission upon him of an assault with a dangerous weapon, without intent to kill or inflict grievous bodily harm, in violation of Code, supra, Article 128, 10 USC § 928. If taken as true, this would support findings of guilty of involuntary manslaughter only, for, at the most, it would indicate an unlawful killing during the commission of an offense directly affecting the person. Code, supra, Article 119.

Thus, the situation presented is not unlike that in United States v Johnson, 3 USCMA 209, 11 CMR 209, where the accused alleged that, while he had taken out his pistol, pointed it *at* his victim, and pulled the trigger, he did so only to frighten him. Holding this statement sufficient to frame an issue of involuntary manslaughter, we pointed out, at page 214:

"The statement of the accused that he intended only to frighten the victim would, if believed, negate the intent to kill or inflict great bodily harm . . . [necessary for a conviction of murder]. It is, therefore, sufficient to frame up an issue . . . [of involuntary manslaughter on the theory] that the killing occurred while the accused was perpetrating an offense directly affecting the person of the victim. . . . Accordingly, an instruction on involuntary manslaughter was demanded. . . ."

Again, in United States v Robertson, 5 USCMA 806, 19 CMR 102, we found involuntary manslaughter to have been in issue and the lack of instructions thereon prejudicially erroneous when the accused admitted striking his victim but denied any intent to kill or inflict grievous bodily harm. See also United States v Moore, supra.

The Government does not dispute the foregoing authorities. Instead, it relies on the time-worn and repudiated doctrine that the lesser crime was not placed in issue, as accused's denial of any intent to harm or kill Perez, in context of the other evidence, is inherently incredible and unworthy of belief. See United States v Jones, 10 USCMA 122, 27 CMR 196; United States v Snyder, 6 USCMA 692, 21 CMR 14; and United States v Desroe, 6 USCMA 681, 21 CMR 3. But, as we

have lately remarked, the credibility of the accused's version of the incident is for the court-martial to determine, after receiving proper instructions. It is not the test for deciding whether lesser included offenses are placed in issue. That matter was settled by our decision in United States v Kuefler, 14 USCMA 136, 33 CMR 348, wherein we declared, at page 139:

"Accused's story may be implausible; it may have been rejected by the fact finders; and, indeed, it may, in light of the other evidence, smack of an afterthought by which he sought to escape his just deserts. But neither this Court, the board of review, nor the convening authority has the right so to pass upon accused's credibility as, by giving controlling weight to the evidence countervailing his declarations concerning the state of his own mind, to reject his testimony as incapable of presenting an issue of fact for decision by a *nisi prius* body. So to act is to make a 'choice which was exclusively a jury choice.' Young v United States, 309 F2d 662, 663 (CA DC Cir) (1962)."

See also United States v Callaghan, 14 USCMA 231, 34 CMR 11.

We decline, therefore, the invitation of appellate Government counsel to substitute ourselves for the fact finders below and determine the accused guilty of murder as a matter of law. Cf. United States v Kuefler, supra. Instead, we conclude the evidence placed involuntary manslaughter in issue and required the law officer to submit that degree of homicide to the court-martial. United States v Johnson; United States v Robertson, both supra. His failure to do so was prejudicially erroneous.

The decision of the board of review is reversed, and the record of trial is returned to the Judge Advocate General of the Army. A rehearing may be ordered.

KILDAY, Judge (concurring):

I concur with Judge Ferguson in his conclusion that the lesser included offense of involuntary manslaughter

was reasonably raised by the evidence and that it was prejudicial error for the law officer to fail to instruct the court-martial on that issue.

Some observations by me on the dissenting opinion seem desirable. In this connection, I shall pretermit a general consideration of the issue of "inherent incredibility," or to what extent it may exist, in Anglo-American criminal jurisprudence. 32A CJS, Evidence, § 1031(3), *et seq.* I shall confine myself to the specific issue before us and the observations made in the dissenting opinion. Initially, it must be borne in mind that the question before us arose during the trial on the merits. The dissenting opinion cites three cases to sustain the action of the law officer in failing to instruct on the lesser included offense because the testimony of the appellant that he did not intend to shoot the deceased was "inherently incredible." The following three cases are cited as sustaining that proposition: Norris v Alabama, 294 US 587, 79 L ed 1074, 55 S Ct 579 (1935); Jackson v United States, 353 F2d 862 (CA DC Cir) (1965); McAbee v United States, 294 F2d 703 (CA DC Cir) (1961).

An examination of Norris v Alabama, supra, reveals that the question there before the Supreme Court did not arise in a trial upon the merits, but upon a motion to quash the indictment upon the ground of exclusion of Negroes from juries in the county in which the indictment was found and to quash the trial venire in the county to which venue had been changed on the same issue. These motions presented an interlocutory question committed to the judge and not to the jury.

In McAbee v United States, supra, the appeal did not involve a trial on the merits but was a motion by the appellant to vacate his conviction, considered some six years after his trial on the merits. The decision of this question was for the judge and not a jury.

In Jackson v United States, supra, the question before the court arose on a motion to suppress evidence secured

in a search alleged to have been illegal. This, too, was an interlocutory question for the decision of the judge.

That a distinction exists between the question now before us and the question involved in the above-cited cases was specifically recognized by the Court of Appeals of the District of Columbia in Jackson v United States, supra, at page 864, of its opinion, in the following language:

"A distinction seems to exist in reviewing judge-made findings in criminal cases between cases where the judge sits in the place of the jury, with the appellate court reviewing his finding of guilt, and where the judge sits and decides matters which traditionally or by statute have been allocated to him. In the former situations, this court applies the same rule it applies in reviewing criminal jury cases: The conviction must be reversed if it is clear 'that upon the evidence a reasonable mind could not find guilt beyond a reasonable doubt.'

"When dealing with findings of a judge on issues other than guilt, however, the test for review, as indicated by the Supreme Court, varies. In cases where the lower court acts concerning matters peculiarly within its discretion, a narrow test is applied. But fact findings unrelated to the exercise of trial court discretion are subjected to a broader test."

Appellant was charged with, and convicted of, unpremeditated murder. To find him guilty of that offense it was requisite that the court-martial find, beyond a reasonable doubt, that at the time he fired his rifle appellant entertained the specific intent to kill or to inflict grievous bodily harm. Appellant testified he did not intend to kill the deceased and denied he intended to hit the deceased with the bullet he fired. That the existence of intent is always and invariably the province of the triers of fact and not of the judge (or law officer in a court-martial) is made clear by the language of the Supreme Court in Morissette v United States, 342 US 246, 273, 96 L ed 288, 306 72 S Ct 240 (1952):

"As we read the record, this case was tried on the theory that even if criminal intent were essential its presence (a) should be decided by the court (b) as a presumption of law, apparently conclusive, (c) predicated upon the isolated act of taking rather than upon all of the circumstances. In each of these respects we believe the trial court was in error.

"Where intent of the accused is an ingredient of the crime charged, its existence is a question of fact which must be submitted to the jury. State court authorities cited to the effect that intent is relevant in larcenous crimes are equally emphatic and uniform that it is a jury issue. The settled practice and its reason are well stated by Judge Andrews in People v Flack, 125 NY 324, 334, 26 NE 267, 11 LRA 807:

'It is alike the general rule of law and the dictate of natural justice that to constitute guilt there must be not only a wrongful act, but a criminal intention. Under our system (unless in exceptional cases), both must be found by the jury to justify a conviction for crime. However clear the proof may be, or however incontrovertible may seem to the judge to be the inference of a criminal intention, the question of intent can never be ruled as a question of law, but must always be submitted to the jury. Jurors may be perverse; the ends of justice may be defeated by unrighteous verdicts, but so long as the functions of the judge and jury are distinct, the one responding to the law, the other to the facts, neither can invade the province of the other without destroying the significance of trial by court and jury. . . .' "

In Young v United States, 309 F2d 662 (CA DC Cir) (1962), the court had before it an assignment that the trial court erred in failing to give a requested charge on the lesser included offense of simple assault where

**379**

the defendant was charged with assault with intent to commit robbery. In reversing, the court used the following language:

". . . However implausible, unreliable or incredible only the jury had the right to make the evaluation of West's testimony. The evidence of a simple assault cannot be regarded as strong or convincing and perhaps the source could well be regarded as of dubious reliability, but the question of its weight and credibility was for the jury. On West's testimony it was possible, even if not necessarily plausible, that West was searching the pockets for weapons not money or other valuables. The evidence was sufficient to warrant a jury to infer that West's intent was to rob, and this intent could be imputed to appellant as an aider and abettor; but it was also sufficient to allow for another permissible verdict, i.e., that appellant was simply assaulting Collins while West searched for weapons. Even when instructed on the lesser included offense of simple assault it would be permissible for the jury to totally disbelieve West or to believe that part which tended to exculpate appellant from an intent to rob. The jury might reasonably conclude that West, by giving this testimony, was trying to do a favor for his friend Young and therefore might reject his explanation as to the object of the search of Collins. But without the critical instruction they would not be afforded the choice which was exclusively a jury choice. The ruling denying the lesser included offense instruction necessarily involved an appraisal of that evidence and West's credibility by the District Judge but the trier cannot withdraw that appraisal from the jury. Kinard v United States, 68 App DC 250, 96 F2d 522 (1938). See also Stevenson v United States, 162 US 313, 323, 16 S Ct 839, 40 L ed 980 (1896)."

In Kinard v United States and Stevenson v United States, cited by the court in Young v United States, supra, it is interesting to note that both cases were reversed for failure to instruct on the lesser included offense of manslaughter in a trial for murder. A reading of those cases will emphasize the necessity of submitting the issue for the determination of the triers of fact. See also United States v Kuefler, 14 USCMA 136, 33 CMR 348.

QUINN, Chief Judge (dissenting):

The accused contended he had no "intentions of shooting that kid," but when Perez made a "break" for the door, he fired "in front of him," and Perez "ran into" his fire. Perez, however, was shot in the back. Powder burns around the wound indicated that the distance between the muzzle of the accused's rifle and Perez' body was about three feet. Other evidence indicates that, moments before the shooting, the civilian occupants of the house fled because of the accused's quarrelsome conduct. In light of the physical facts and the glaring inconsistencies in the accused's testimony, his denial of an intent to shoot at, or harm, Perez is absolutely incredible.

In an earlier day, this Court recognized, and applied the rule, that testimonial assertions by a witness, including the accused, which are inherently inconsistent, or basically opposed to common experience and physical fact, do not create an issue. We were not unique in this respect. The Supreme Court of the United States has refused to give legal effect to inherently incredible testimony, and Federal Courts of Appeals have decided cases on the basis that certain testimonial assertions were unbelievable as a matter of law. For example, in Norris v Alabama, 294 US 587, 599, 79 L ed 1074, 55 S Ct 579 (1935), the Supreme Court reversed a conviction because Negroes were systematically excluded from the jury, notwithstanding a jury commissioner testified he did not know a single Negro who met the qualifications prescribed by the State constitution; the Court said it found "it impossible to accept" his statement. In McAbee v United States, 294 F2d 703, 706 (1961), the Court of Appeals for the District of Columbia Circuit rejected a defense contention that the

trial judge's instructions were prejudicially deficient because it determined the evidence upon which the contention was based was "simply . . . unbelievable." The same court overturned a conviction because the testimony of a police officer was internally inconsistent and contrary to human experience. In part, it said:

". . . Sometimes, it is possible to disprove testimony as a matter of logic by the uncontradicted facts or by scientific evidence. . . . But the doctrine of inherent incredibility does not require such positive proof. It is enough to invoke the doctrine if the person whose testimony is under scrutiny made allegations which seem highly questionable in the light of common experience and knowledge, or behaved in a manner strongly at variance with the way in which we would normally expect a similarly situated person to behave." [Jackson v United States, 353 F2d 862, 867 (CA DC Cir) (1965).]

It has been suggested that appellate courts apply a different standard to review findings of fact by a trial judge as to issues other than guilt from that utilized to review findings of fact by the judge or the jury on the question of guilt. Assuming the correctness of the suggestion, the standard of review is entirely immaterial in determining the legal consequence of particular testimony. In other words, the question on this appeal is whether part of the accused's testimony as to his intention, while firing an automatic rifle at his victim, was legally sufficient to require the law officer to instruct on a lesser offense to that charged. The law officer, who alone is responsible for the instructions, determined that it was not. I agree with him. The law officer was not deprived of his power to disregard testimony as incredible merely because the testimony was given by accused. If a prosecution witness testified that he identified the accused as the assailant from a distance of ten miles, without the aid of any device, the law officer is surely entitled to instruct the court members to disregard that testimony as incredible. In my opinion, he is similarly entitled, in framing his instructions, to disregard inherently incredible testimony by the accused.

In recent years, my brothers have accepted some extraordinary testimony as a basis for imposing upon the law officer a *sua sponte* obligation to instruct on an issue which was not perceived at trial. Perhaps I am more prosaic and less imaginative than my brothers in contemplation of the vagaries of human experience, but there is, I am sure, some point of credulity beyond which no one can go. In my book, that point is reached as to a person's professed intention, when his actual conduct is absolutely opposed to his asserted state of mind. For example, if during a quarrel A points a high caliber gun at B's heart and, knowing that the gun is loaded, deliberately pulls the trigger, sending a bullet into B's heart, a later assertion by A that he did not intend to harm B is just unbelievable. I, for one, cannot accept the assertion as good cause to import prejudicial error into instructions to which the accused did not object. See my dissent in United States v Kuefler, 14 USCMA 136, 33 CMR 348. We held specifically to this effect in a case involving circumstances substantially similar to those present here. In United States v Snyder, 6 USCMA 692, 697–698, 21 CMR 14, we said:

"So far as involuntary manslaughter is concerned, it was originally the contention of defense counsel at trial, reiterated before us on appeal, that it was raised as an issue, for there was evidence that 'the killing occurred while the accused was perpetrating an offense directly affecting the person of the victim, i.e., assault with a dangerous weapon.' Counsel, to substantiate the assertion, points to the evidence that an altercation arose between Webb and the accused, and that a certain amount of physical contact was evident to the witnesses. This, it is argued, coupled with the accused's assertion that he only intended to bluff the victim, negates any intent to kill or do

**381**

great bodily harm. It would seem that counsel's argument defeats his contention, for he admits, for the purposes of this issue, that the accused committed an assault with a dangerous weapon. It is not doubted that, according to the accused's testimony, he drew his dagger and, with one circular sweep of his arm, inflicted the fatal wound. We have no difficulty in concluding that a 10½ inch dagger with a 6½ inch blade is, when used as a dagger, a dangerous weapon as a matter of law. . . . Having conceded, arguendo, the commission of the offense of assault with a deadly weapon, accused's contention that he did not intend to use the knife to inflict great bodily harm becomes unworthy of belief. . . . One who uses a two-edged razor-sharp dagger at such close proximity, and with the force of a good swing, cannot help but intend to do great bodily harm. . . . Under those circumstances, the disclaimer of any intent to do great bodily injury is incredible."

In the words of George Santayana, "Those who cannot remember the past are condemned to repeat it."

As to the instructions on justification for the shooting, since they are not discussed in the principal opinion, I need not elaborate on my own views. Suffice it that I am satisfied they fairly presented the accused's defense. I would, therefore, affirm the decision of the board of review.