UNITED STATES, Appellee

v

JAMES P. A. DANIEL, Jr., Specialist Four,
U. S. Army, Appellant

16 USCMA 492, 37 CMR 112

No. 19,539

February 3, 1967

*Captain Kenneth J. Stuart* argued the cause for Appellant, Accused.

With him on the brief were *Colonel Daniel T. Ghent* and *Lieutenant Colonel Martin S. Drucker.*

*Captain Louren R. Wood* argued the cause for Appellee, United States. With him on the brief were *Colonel Peter S. Wondolowski, Colonel Joseph J. Crimmins,* and *Lieutenant Colonel Francis M. Cooper.*

## Opinion

QUINN, Chief Judge:

As a result of an early morning street fight, the accused was charged with premeditated murder of a German civilian, in violation of Article 118, Uniform Code of Military Justice, 10 USC § 918. At trial, before a general court-martial, he initially entered a plea of not guilty but, before the case was submitted to the court members for findings, he changed the plea to guilty of involuntary manslaughter, in violation of Article 119, Code, supra, 10 USC § 919. However, the court-martial convicted him of unpremeditated murder, and imposed a sentence which included confinement at hard labor for forty years. The convening authority approved the findings of guilty and the sentence, but the board of review modified the latter to reduce the period of confinement to twenty-seven years. On this appeal, the accused contends he was prejudiced by several alleged deficiencies in the law officer's instructions.

The first assignment of error challenges the denial of a requested instruction on voluntary manslaughter. In an out-of-court hearing, defense counsel argued that the evidence in the case required an instruction on the effect of fear sufficient to produce heat of passion in the accused. See United States v Desroe, 6 USCMA 681, 21 CMR 3. The law officer denied the request. His ruling is fully supported by the record of trial.

Appellant testified on the merits. His testimony provides the best evidence of his emotional state at the time he pulled out a pistol and shot the victim. According to his version of the events, he, three fellow soldiers and his girl friend, were standing by his car on Leopold Strasse, Munich, Germany, at about 2:00 a.m. Three "guys" approached the girl and said something to her. She walked away from them, and they started up the street away from the accused's group. The accused went to his car, took out a pistol, and hurried after them. He stopped them at the corner to find out "what they were trying to do." The trio turned around at the accused's call, and moved toward him. He pulled out his pistol, and told them not to get " 'too close.' " Someone shouted " '[t]he police are coming,' " and the accused turned back toward his own group. Looking behind to see if any of the trio had followed him, he saw no one. About that moment he was "jumped" from behind by a German civilian. The man wrapped his arms around the accused, and pinned the accused's arms to his side. They struggled for a few minutes. The accused "hollered" to his companions for help which, other evidence shows, was immediately provided. The accused broke away from the German. As he did so, he was struck across the neck with the base of the hand by a German later identified as Thomas Schaupp. Off balance, he staggered to the opposite side of the street, about fifteen to eighteen feet away from Schaupp. There he pulled the pistol from his belt. His account of what transpired next is as follows:

"Q. [Defense Counsel] Now, you say you pulled the gun and then it went off. Could you explain that a little clearer?

"A. Well, I pulled the gun out of my belt, and as I brought it around I had it in front of me, and I started to raise it and it went off.

• • • • •

"Q. At that particular time did you intend to shoot the weapon?

"A. No, I did not.

**493**

"Q. Did you ever intend to shoot the weapon that night?

"A. No, I did not.

• • • • •

"Q. In fact, from the time you pulled out the weapon, what's the next thing you remember?

"A. The weapon going off.

"Q It just went off?

"A. Right.

• • • • •

"Q. But at no time that night did you ever intend to use that pistol?

"A. No, I did not.

• • • • •

"Q. [Trial Counsel] . . . Now, was anybody coming after you when that gun was pulled out the last time?

"A. I don't remember whether he was coming after me or not.

"Q. You don't remember?

"A. No.

• • • • •

"Q. And you pulled the gun out and you were looking in the direction and you aimed the gun in the general direction of the stand-out figure of the victim and the figures of the other persons standing there; is that right?

"A. Well, I didn't actually aim the gun at him.

"Q. Well, what did you do with the gun?

"A. I pulled it out of my belt and brought it around in his direction, and as I started to bring it up it went off.

• • • • •

"Q. But you saw the figures of the people over there; is that right?

"A. Right.

"Q. And this was to do what; to defend yourself? Were you prepared to kill a man to defend yourself?

"A. No.

"Q. What was the purpose of drawing a gun?

"A. To scare him.

"Q. You were going to scare him?

I think you testified that no one was coming after you. What were you going to scare them from doing?

"A. He had already hit me once. I didn't know whether he was going to do it again.

"Q. And you think that by pulling the gun it would keep him from hitting you again; is that what you wanted to keep him from doing?

"A. Right.

• • • • •

"Q. . . . I think you testified this way: that you said that you didn't pull the trigger, or you didn't remember pulling the trigger. Are you telling the court that the gun went off without somebody pulling the trigger?

"A. No.

"Q. Somebody pulled the trigger?

"A. Somebody.

"Q. Who?

"A. It was me, but I don't remember pulling it.

"Q. You don't remember pulling it. I just wanted to clear that one point up. You don't deny the fact now, Daniel, that you were on the business end of that gun and that gun went off and it killed Thomas Schaupp? You don't deny any of that, do you?

"A. Right.

"Q. And you don't deny that at the time that you pulled that gun, you knew the gun was loaded, didn't you? You knew there were rounds in that magazine?

"A. I knew there were rounds in the weapon. Whether it was loaded or not, I don't know.

"Q. You don't remember whether or not you operated the slide at that time?

"A. I don't remember doing it, no.

• • • • •

"Q. [Law Officer] Was anybody coming towards you? I think you testified no one was coming towards you.

"A. I didn't know whether the man was coming toward me or not."

From no standpoint does the accused's testimony support a conclusion he shot Schaupp because he was so enraged at Schaupp's attack, or so feared Schaupp or another German civilian would continue the attack that he was roused to heat of passion. The accused expressly and emphatically disclaimed an intent to kill or inflict grievous bodily harm. The one point he emphasized was that the pistol went off without any intention on his part. Nothing in his testimony indicates in the slightest degree that he acted in heat of passion caused by fear. There is a similar absence of testimony to this effect in the Government's case.[1] The requested instruction was, therefore, properly refused. See United States v Madison, 14 USCMA 655, 658–659, 34 CMR 435.

A second requested instruction is the subject of the accused's second assignment of error. This request was also denied. It is as follows:

"You are hereby instructed that if you find the accused was justified in drawing his pistol in self-defense and that the pistol was discharged unintentionally, thereby killing the victim, then you must return a finding of not guilty."

Since the accused pleaded guilty to involuntary manslaughter, in violation of Article 119(b) of the Uniform Code, supra, it is difficult to understand his present contention that he was prejudiced by the failure to give an instruction which would have required the court-martial to find him innocent of any wrong. Appellate defense counsel contend the plea of guilty should not be considered by this Court in assessing the merits of the contention, because the plea of guilty was the product of "blatant . . . coercion." This argument is the exact opposite of the representations made by defense counsel and the accused to the law officer at trial.

There, the accused and his counsel informed the law officer the change in plea from not guilty to guilty of involuntary manslaughter was the result of the accused's "own free will," and had been determined upon only after both defense lawyers had fully explained its meaning and effect to the accused. The accused personally told the law officer he wanted to enter the plea of guilty to involuntary manslaughter because he was "in fact guilty." He also said he and his counsel "all agreed" the change in plea was the "best action" he could take in light of "the evidence that has been presented in this case." However, disregarding the inconsistency between the accused's trial representations and his present contention, the law officer correctly denied the requested instruction.

If the accused had shot the victim in self-defense, he would, of course, have been excused from all criminal liability for Schaupp's death. However, the accused did not contend he shot in self-defense. Defense counsel specifically conceded the accused did not rely upon that defense. In the discussion on the requested instruction, he acknowledged the accused "was not justified in shooting the man," and insisted the defense position was that the shooting was "unintentional." If the shooting had been "unintentional," the accused would still not be entitled to an acquittal, as the requested instruction indicated. Assuming the circumstances justified the accused's displaying the gun (see United States v Vaughn, 15 USCMA 622, 628, 36 CMR 120), he could not, however, handle the lethal instrument in so negligent a manner as to allow it to fire directly into a group of persons only fifteen to eighteen feet away. United States v Pemberton, 16 USCMA 83, 36 CMR 239; United States v Madison, supra. As we pointed out in *Pemberton,* at page 84, "accident is not synonymous with unintentional injury." To be excused

---

[1] A Government witness testified the accused made certain motions with his left hand before the gun fired. The testimony justifies an inference that the accused first deliberately cocked the gun, and then fired.

from all criminal liability, the act which resulted in the death of the victim had to be unexpected. The accused's withdrawal of the pistol from his belt was deliberate and intentional. He admitted he "pulled the trigger," while the pistol was pointed in the direction of the victim and "other figures." These circumstances clearly would have justified a finding of guilty of involuntary manslaughter by culpable negligence. United States v Madison, supra, page 658; United States v Redding, 14 USCMA 242, 246, 34 CMR 22. Consequently, the law officer properly rejected the requested instruction, which would have required the court-martial to acquit the accused.

The final assignment of error challenges the law officer's refusal to instruct on involuntary manslaughter under Article 119(b)(2). This offense is committed when an illegal act of the accused, directly affecting the person of the victim and not one of those specified in Article 118(4) (burglary, rape, robbery, etc.), causes the victim's death. After the Government rested its case and before the accused changed his plea, defense counsel argued the evidence justified a finding that the accused was engaged in an assault upon the victim and, therefore, the lesser offense of involuntary manslaughter under Article 119(b)(2) was placed in issue. See United States v Moore, 16 USCMA 375, 36 CMR 531. Assuming such a finding possible, it hardly would be preferred to involuntary manslaughter resulting from culpable negligence, to which the accused pleaded guilty. To many persons, causing the death of a human being by culpable negligence is much less heinous an act than causing death while engaged in an assault with a dangerous weapon. Cf. United States v Thurman, 10 USCMA 377, 27 CMR 451; United States v Underwood, 10 USCMA 413, 27 CMR 487. Be that as it may, the accused's plea of guilty to involuntary manslaughter eliminated both the possibility of an acquittal and the possibility he might be convicted of a lesser offense. Generally, the failure to instruct on the elements of an offense to which the accused pleads guilty is not prejudicial error. United States v Cruz, 10 USCMA 458, 28 CMR 24. See also United States v Glover, 2 USCMA 164, 7 CMR 40. The offense to which the accused pleaded guilty can be predicated upon different acts, but each constitutes the offense; and each carries the same punishment. Manual for Courts-Martial, United States, 1951, Table of Maximum Punishments, paragraph 127c, page 223. We perceive no likelihood of prejudice merely because the accused chose to rest his plea of guilty upon one act in violation of Article 119(b), rather than another.

The decision of the board of review is affirmed.

KILDAY, Judge (concurring in the result):

On the facts revealed by the record in this case, I concur in the result reached by Chief Judge Quinn. There seems to be no doubt but that appellant, in his testimony, eliminated any issue of voluntary manslaughter by his denial of any intentional firing of the pistol. He is in a position analogous to an accused who complains of the sufficiency of an instruction on self-defense when in his testimony he has denied having committed an assault. United States v Duckworth, 13 USCMA 515, 33 CMR 47.

We need not decide whether appellant was entitled to an instruction on involuntary manslaughter under Article 119(b)(2), Uniform Code of Military Justice, 10 USC § 919, for in view of his plea of guilty to involuntary manslaughter under Article 119(b)(1), there could be no prejudice in refusing to grant the same.

FERGUSON, Judge (dissenting):

I dissent.

The accused's testimony and belated plea of guilty to involuntary manslaughter, in violation of Uniform Code of Military Justice, Article 119, 10 USC § 919, admit only that he, without justification or excuse, proximately

caused the death of Thomas Schaupp by an act which *at least* involved culpable negligence. The theme of the principal opinion seems to be it also had the effect of eliminating all other lesser included offenses from issue— a sort of "all or a little bit" variation on the "all or nothing" theory which this Court rejected in United States v Moore, 12 USCMA 696, 31 CMR 282. One must, however, look to the whole evidence to determine what lesser offenses were placed in issue. When this record is so viewed, in my opinion, the law officer was required, in accordance with the requests which defense counsel submitted, to instruct on the elements of voluntary manslaughter and involuntary manslaughter of the assault type, both in violation of Code, supra, Article 119. As he did not do so, prejudicial error is present and we should reverse. Accordingly, I respectfully note my dissent to the contrary result reached by my brothers.

I

The Chief Judge initially notes an absence of testimony to raise any issue of voluntary manslaughter in the Government's case. I disagree and believe a recital of the evidence will demonstrate the opposite conclusion should be reached.

On September 4, 1965, Specialist Fourth Class Daniel, his girl friend, Private Kopanski, Private Vacchiani, and Private Myers were standing in a group near Daniel's automobile on Leopold Strasse, in Munich, Germany. Three colored soldiers came "by and said something to Daniel's girl friend." One "stuck his arm out and Daniel's girl friend jumped back." One of Daniel's friends said "something" to him about it. He reached into his car, procured a .45 caliber automatic pistol, and pursued the soldiers down the street. After engaging in an insulting verbal interchange with them, during which he pointed the pistol at one who advanced on him, Daniel stuck the gun in his waistband and walked back toward his car and companions. As one of the colored soldiers kept following him, he again drew his weapon, whereupon it appears the colored group left the scene. As Daniel continued his return to his car, a German bystander suddenly grabbed him. Daniel, however, threw him to the ground. Private Myers ran up and assisted the German in rising. Daniel "put his gun away," at Private Vacchiani's request, said " 'It's all over' " and "wanted to walk off."

At this point, the victim, Thomas Schaupp, entered the scene. He spoke a few words to the German earlier struck by Daniel; went over to Daniel; struck him "in the face" with a karate-type blow; and they scuffled together. When the two protagonists fell against a parked car, "two other German guys jumped on Daniel." The accused called for help, whereupon Vacchiani, Myers, and Kopanski intervened and freed him from their grasp. Daniel parted from the group. As he passed in front of Private Myers, the latter pushed one of the Germans toward him. Daniel, stopped by a retaining wall, turned, drew his pistol, and the fatal shot was discharged.

Shortly after the occurrence, Daniel met a Specialist Fourth Class Neumeyer at "Lola's Bar." He told Neumeyer "he has just shot a guy" and "he explained to me what exactly happened that caused this—that caused this shooting." The following testimony was received concerning this explanation:

"Q. Did he state a reason why he shot this person?

"A. Yes, sir, he did. He said that this German hit him in the left— in the right side of his face; hauled off and hit him. And he showed me where he had hit him. It was all red. And he said, 'Here, feel it,' and I did, and you could see one side was red and the other side was white. And he said, 'This German hit me, you know,' and he said, 'I became so enraged.' I don't remember what exactly he said after that, after he did tell me 'This German hauled off and hit me.' "

For the defense, evidence was ad-

duced of the victim's prior criminal record for insult, resisting apprehension, aggravated larceny, and aggravated assault, the inference being that he was a person of violence. Witnesses testified accused's character, on the other hand, was that of an orderly, peaceful individual.

Accused appeared as a witness in his own behalf. His testimony did not substantially differ from that of prosecution witnesses as to the circumstances surrounding the homicide. He declared, however, that he was motivated to draw his pistol on the last occasion through fear that Schaupp and the other Germans were about to renew their attack upon him. He also declared he did not intend to fire it but presented it merely to frighten them off. He conceded, however, that the gun would not discharge unless the trigger was pulled and that his finger was on the trigger. He nevertheless insisted the shooting was unintentional.

After both sides had rested, an out-of-court hearing was held on the question of instructions. Defense counsel requested that advice be given the court on the lesser included offense of voluntary manslaughter on the basis of evidence of accused's rage at being struck by the Germans and his fear that they would renew their assault upon him. The law officer peremptorily denied the request. A subsequent request for instructions on involuntary manslaughter based upon unintentional death occurring during the course of an assault with a dangerous weapon was similarly rejected.

At the next session of the court, another out-of-court hearing was held, in which the accused voluntarily and providently entered a plea of guilty to involuntary manslaughter through culpable negligence. This plea was subjected to careful inquiry by the law officer and, after persistence therein by the accused, accepted by the court. Nevertheless, accused was subsequently found guilty of unpremeditated murder in violation of Code, supra, Article 118, 10 USC § 918,

**498**

## II

I believe it clear the evidence adduced by the United States raises the lesser offense of voluntary manslaughter. It demonstrates a violent attack on accused by three Germans led by the deceased, who opened the matter with a severe karate-type blow to the accused's head. Its aftereffects were still clearly visible to Specialist Fourth Class Neumeyer, who saw the accused at Lola's Bar following the incident and to whom accused confided his enraged motivation for the slaying.

In United States v Bellamy, 15 USCMA 617, 36 CMR 115, it appeared accused was struck with a pool cue during an altercation over a billiards game. Accused left the scene, armed himself, sought out his attacker, and slew him. In holding voluntary manslaughter in issue, the Court, over Chief Judge Quinn's dissent, said, at page 621, "Clearly, this is some evidence of the provocation necessary to raise the issue of voluntary manslaughter."

In United States v Judkins, 14 USCMA 452, 34 CMR 232, the Court declared, at page 456:

"First, we observe the ultimate determination of the existence, and degree of such fear [inducing passion] is for the triers of fact."

Moreover, in the same case, we specifically declared we determined the issue to be raised "on the entire record." Id., at page 457.

In United States v Desroe, 6 USCMA 681, 21 CMR 3, the accused and his victim were engaged in fisticuffs, during a drunken brawl. Desroe stabbed the victim to death, alleging he did so because he feared the latter would choke him to death. He specifically denied any desire to kill him. Expressing "no hesitancy in concluding that the evidence raised reasonably an issue of voluntary manslaughter," the Court declared, at page 691:

". . . This principle is impliedly recognized by the Manual, which lists a grievous assault and battery

as an example of adequate provocation. Manual for Courts-Martial, United States, 1951, paragraph 198*a*, page 354. Surely such an act is as likely to arouse fear as rage."

The principle to be derived from the foregoing is clearly that vicious assault, fistic or otherwise, may be adequate provocation to raise the issue of voluntary manslaughter when such eventually lead an enraged accused to slay his opponent. The question whether it is such adequate provocation or whether accused acted in heat of passion is one of fact for the court members, and is not to be decided by the law officer. United States v Bellamy, United States v Judkins, both supra. Turning to the evidence before us, the record reveals accused was struck a karate-type blow; that he was jointly assaulted by three men; that he declared shortly thereafter the attack so enraged him that he killed the victim; and, at the trial, that such placed him in fear. The lethal nature of karate is well known; pictures of bricks and boards being split with the edge of a man's palm are commonplace; surely, resort to such measures must be considered "an act . . . as likely to arouse fear as rage." United States v Desroe, supra, at page 691. I would conclude, therefore, that, on the whole evidence, voluntary manslaughter was placed in issue.

### III

The evidence likewise places in issue the commission of involuntary manslaughter through unintentionally causing death during an assault with a dangerous weapon. Again, the proof tends to demonstrate the accused, freeing himself from his assailants, turned, drew, cocked, and fired his weapon. He declared the firing was unintentional. Conceding that no justification existed for the action, and, for purposes of raising the issue, according, as we must, credibility to his denial of an intentional firing of the weapon, it is apparent he would be at least guilty of assault with a dangerous weapon and that death caused unintentionally thereby would amount to involuntary manslaughter, in violation of Code, supra, Article 119. United States v Moore, 16 USCMA 375, 36 CMR 531; United States v Taylor, 16 USCMA 489, 37 CMR 109.

In *Moore*, supra, the accused admitted firing his weapon but denied any intent to strike his victim, alleging he shot only to prevent him from leaving the scene of the homicide. In holding involuntary manslaughter in issue, we said, at page 377:

"Assuming accused's fears concerning Perez and any connection he might have with rebel activities were totally unjustified, but that he spoke truthfully in stating he shot only to stop his victim's escape and not in any manner *at* him, it would appear the deceased was unlawfully killed during the commission upon him of an assault with a dangerous weapon, without intent to kill or inflict grievous bodily harm, in violation of Code, supra, Article 128, 10 USC § 928. If taken as true, this would support findings of guilty of involuntary manslaughter only, for, at the most, it would indicate an unlawful killing during the commission of an offense directly affecting the person. Code, supra, Article 119."

And in United States v Johnson, 3 USCMA 209, 11 CMR 209, wherein the accused alleged that, while he had drawn his pistol, *pointed it at his victim, and pulled the trigger,* he did so only to frighten him, we held, at page 214:

"The statement of the accused that he intended only to frighten the victim would, if believed, negate the intent to kill or inflict great bodily harm . . . [necessary for a conviction of murder]. It is, therefore, sufficient to frame up an issue . . . [of involuntary manslaughter on the theory] that the killing occurred while the accused was perpetrating an offense directly affecting the person of the victim. . . . Accordingly, an instruc-

tion on involuntary manslaughter was demanded. . . ."

See also United States v Robertson, 5 USCMA 806, 19 CMR 102.

The *Johnson* case set forth facts which, so far as the actual homicide is concerned, precisely parallel the situation now before us. *Moore,* supra, applies the same principle to similar facts. Here, too, accused averred resort to his weapon was for the purpose of frightening off Schaupp and his combative companions and that there was no intent on his part to fire at them. Such evidence, if believed, plainly amounts to death occurring during "the commission . . . of an assault with a dangerous weapon, without intent to kill or inflict grievous bodily harm, . . . [and] involuntary manslaughter only." United States v Moore, supra at page 377. The choice thus delineated was one for the jury to make and not a decision for the law officer or, indeed, this Court. See concurring opinion, Judge Kilday, United States v Moore, supra. Accordingly, it is apparent that involuntary manslaughter was in issue and should have been the subject of appropriate instructions by the law officer.

## IV

Despite the foregoing, my brothers seemingly find an inconsistency between lesser included offenses being raised and accused's plea of guilty to involuntary manslaughter by culpable negligence, as well as his testimony that the shooting was unintentional.

Taking these matters in reverse order, it should be apparent that we do not judge whether lesser included offenses are in issue on the basis of simple inconsistencies in the testimony of various witnesses, including the accused. Rather, we look to the whole record. United States v Bellamy, supra. True, the accused's testimony alone may raise an issue. United States v Moore, 16 USCMA 375, supra. But the fact that he declares one situation to exist and the Government's witnesses aver the contrary does not mean the latter's testimony cannot raise other lesser offenses. To assert such a proposition is to return to the discredited "all or nothing" theory which we discarded in United States v Moore, 12 USCMA 696, supra. Moreover, even that contention lacks validity here when the record shows that the defense counsel requested instructions on voluntary manslaughter, based upon accused's recital of his fears and the Government's own proof that Daniel declared he was led to kill Schaupp through rage at the multiple attack upon him. In short, the real basis for the decision here simply flies in the face of our former holdings that the presence of some evidence—not credibility of the witnesses—is the proper standard for determining whether a lesser included offense is raised.

In like manner, I believe the principal opinion misapprehends the effect of a guilty plea. A plea concedes nothing beyond the well-pleaded facts necessary to convict an accused of the lesser offense to which it relates. United States v Dinsmore, 11 USCMA 28, 28 CMR 252; United States v Robertson, 11 USCMA 36, 28 CMR 260. Thus, the accused's plea of guilty here admitted that Mr. Schaupp was dead; that death proximately resulted from an act on the part of the accused which was *at least* culpably negligent. More than that accused did not admit, for by such a plea he left in issue the question of the intent required in the greater offense charged as well as those circumstances which might dethrone the reason and thus reduce malicious killing to one without malice, *i.e.,* voluntary manslaughter. Cf. United States v Dinsmore, supra. Thus, such plea has no effect on the prosecution's evidence that the slaying was deliberate and intentional, and the jury was free to accept it under proper instructions. Indeed, if the plea eliminates other lesser offenses and admits guilt as a whole, then the jury could only have either found accused guilty as charged or as he pleaded. This would be "all or nothing" with a vengeance! It

seems clear, however, as I have pointed out, that the plea admits only guilt of involuntary manslaughter and, beyond that, has no effect as to possible greater, albeit intermediate offenses.

In the same vein, I point to the defect which I perceive in my brothers' reasoning as to the lack of prejudice involved in failing to instruct on one species of involuntary manslaughter when the accused has pleaded guilty to another. Had the accused been convicted in accordance with his plea, the argument would make sense. He was, however, convicted of unpremeditated murder, and therein lies the flaw. If lesser included offenses are raised by the evidence, instructions thereon must be given to the fact finders so that they, gauging the credibility of the witnesses, can make an informed choice as to the degree of accused's guilt. United States v Moore, 16 USCMA 375, supra, concurring opinion of Judge Kilday. The fact that he has pleaded guilty to causing Schaupp's death through culpable negligence does not eliminate the separate species of manslaughter occurring when death unintentionally results during an assault with a dangerous weapon. It was an alternative raised by the evidence, quite without regard to the nature of the offense to which accused pleaded. Given advice thereon, the court may well have found an aggravated assault to have occurred, resulting in Schaupp's unintentional death, even though they had no thoughts on the separate question of culpable negligence. In brief, a plea of guilty to a particular offense excuses only instructions on the elements of that crime and not on the entirely different elements of another offense, even though both have been lumped by Congress in the same general category. That is all I understand United States v Cruz, 10 USCMA 458, 28 CMR 24, to hold, as regards instructions. United States v Glover, 2 USCMA 164, 7 CMR 40, on which the Chief Judge also relies, is likewise limited to a plea of guilty to the very crime on which instructions were omitted. Hence, 1 believe it apparent the accused was entitled to his requested instructions on the lesser included offense of "misdemeanor-manslaughter," in violation of Code, supra, Article 119, quite without regard to his plea.

V

In sum, then, I would look to the whole record in determining whether lesser included offenses were placed in issue. On that basis, as exemplified in our prior decisions, voluntary manslaughter and involuntary manslaughter by aggravated assault were clearly presented as alternatives to the offense found by the court-martial and that to which accused pleaded. As the law officer denied instructions requested on the elements of both these lesser crimes, I believe reversal is required. United States v Moore, 16 USCMA 375, supra; United States v Bellamy, supra.

I would reverse the decision of the board of review and return the case for approval of findings of guilty of involuntary manslaughter and reassessment of the sentence or a rehearing.